Wesley E. ARCHER et al., Appellants,

v.

BROWN & ROOT, Inc., and T. L. James & Co., Inc., d/b/a Louisiana Bridge Co., Appellees.

No. 16289.

United States Court of Appeals Fifth Circuit.

Feb. 21, 1957.

Rehearing Denied April 3, 1957.

**664**

Gordon Goodbee, Covington, La., Bessie Margolin, Asst. Sol. Dept. Labor, Sylvia S. Ellison, Atty., Dept. Labor, Stuart Rothman, Sol. Dept. Labor, Washington, D. C., Lawrence P. Hochberg, Dept. of Labor, Washington, D. C., Earl Street, Regional Atty., Dallas, Tex., for appellants.

Ben H. Powell, Jr., Houston, Tex., James W. Wilson, Austin, Tex., Howard W. Lenfant, New Orleans, Lenfant & Villere, New Orleans, La., Powell, Wirtz, Rauhut & McGinnis, Austin, Tex., of counsel, for appellees.

Before RIVES, TUTTLE and BROWN, Circuit Judges.

JOHN R. BROWN, Circuit Judge.

The District Court, sustaining the Employer's motion for summary judgment, held that persons working on (a) the construction of the Lake Pontchartrain Causeway, (b) the production of materials for use in its construction, and (c) the construction of the field plant for the production of materials essential to construction of the Causeway, were not "engaged in commerce or in the production of goods for commerce * * *," 29 U.S.C.A. §§ 201, 206, and hence were not entitled to recovery of overtime and statutory penalties. A determination of noncoverage as to (a) is decisive, for (b) and (c) fall automatically with it. If coverage exists as to (a), the Employer virtually concedes (b), but vigorously asserts that (c) is still not within the Act.

(a) Construction of the Causeway

Since the Causeway represented something entirely new, not previously in existence to any degree, the status of coverage depends, not on the nature of the physical operations performed by the workers, but on the nature of this project as a facility of interstate commerce. The workers, joined here (as *amicus curiae*) by the Secretary of Labor as a formidable ally, claim that Mitchell v. Vollmer & Co., 349 U.S. 427, 75 S.Ct. 860, 99 L.Ed. 1196, means not only what it says, but what the Court later said it said, " * * This Court recently rejected the 'new

construction' doctrine in determining whether an employee is 'engaged in commerce' within the meaning of a like provision in the Fair Labor Standards Act * * *," Southern Pacific Co. v. Gileo, 351 U.S. 493, 500, 76 S.Ct. 952, 957, 100 L.Ed. 1357, 1365, so that "new construction" is now altogether insignificant. The Employer insists that Gileo is dicta and that Vollmer merely applied, without extension, the prior law, Chambers Construction Co. v. Mitchell, 8 Cir., 233 F.2d 717, 721, Wecht, Wage-Hour Law—Coverage (1951) at page 84, that a piece of new construction was covered if, as a repair, modification, extension or improvement of an *existing* facility, it had a vital relationship to the functioning of such an instrumentality or facility. So read, Vollmer became no pronouncement of a new principle, but simply a reversal of our decision, 214 F.2d 132, for error in that particular case. The path, likely somewhere between these extremes, we need not mark with precision. For here, as in Mitchell v. Hodges Contracting Co., 5 Cir., 238 F.2d 380, we decline, as unnecessary and unwise, the invitation to press the full limits of "naked" new construction under Vollmer.

Lake Pontchartrain (approximately 45 miles long east to west, and 25 miles north to south) is so situated with respect to the trade and commerce area of metropolitan New Orleans, located midway on the south side, that traffic from a northerly and northeastly direction has to follow a circuitous route around the south side of the Lake. With the spectacular commercial expansion of this area, the establishment of new businesses, the construction of new extensive industrial plants and the natural influx of people, the resultant traffic congestion presented a problem of great concern to the people of this area and Louisiana. To eliminate the circuitous route, to relieve already overburdened highways on the south side and to facilitate the flow of traffic in and out of New Orleans, the Lake Pontchartrain Causeway was conceived. By acts of the legislature, Act 90, Louisiana Legislature 1952 and the organic authority of the 1952 Constitutional Amendments, amending Subsection (g), Section 22, Article VI of the Constitution of Louisiana, LSA, the Parishes of Jefferson and St. Tammany and the specially constituted Greater New Orleans Expressway Commission, their operating agency, were authorized to build this Expressway and to finance its construction by 40-year Revenue Bonds from toll charges supplemented by substantial annual amounts from State Highway Fund No. 2 which came from all motor vehicle registration fees collected by the six parishes contiguous to Lake Pontchartrain. From the interim payments into Fund No. 2, a reserve of $5,000,000.00 had actually accumulated when the construction contract was let. Out of this reserve, the State Highway Department was obligated to construct access approach roads to the Expressway. The Expressway was declared to be "a part of the State Highway System * *," Act 90, supra; 1952 Constitutional Amendment, supra.

After extensive engineering and traffic studies, the Expressway was designed —as a production indigenous to this dynamic area almost had to be—as the world's longest bridge, to run 25 miles across the Lake, its southern end in the western part of metropolitan New Orleans just inside the Jefferson Parish line as required, and the opposite end, almost due north, just west of Mandeville, Louisiana in St. Tammany Parish. To finance the contract cost of $30,677,210.-00 for the Bridge and its main approaches and the further estimated cost of $2,700,000.00 for extensions beyond the south terminus, plus all other direct costs aggregating $37,102,513.00, tax-exempt Revenue Bonds totaling $46,000,000.00 were issued and sold to investors.

The project, as adopted and officially represented by the contracting Parishes, made the Expressway something far beyond a highway of local value and convenience. For the contract expressly included the construction of three separate four-lane approach roads tying the north end of the Causeway into Highway U. S.

190 to give ready access to all traffic to and from points west, east and north on this arterial interstate highway. U.S. 190 is one of the principal arteries from East Texas through middle South Louisiana and Baton Rouge terminating in U.S. 11, a north-south highway and U.S. 90, an east-west artery, near the extreme easterly end of the Lake. These approaches provide access also to a network of State designated highways leading by several routes directly into Mississippi to connect there with similar State and Federal arteries. On the south end, the project called for the Expressway to run 3.2 miles on land to specifically tie into Airline Highway (U.S. 61 and 65), an important artery leading from Arkansas and Mississippi down through Baton Rouge, past Moisant International Airport, into the heart of New Orleans, connecting there with U.S. 90 to the east. And, as a part of the related projects to be financed from the accumulated reserve of $5,000,000.00 in State Fund No. 2, the State Highway Department became obligated to extend a four-lane super highway southward beyond Airline Highway to connect, by suitable traffic interchanges, with Jefferson Highway, U. S. 90, the main transcontinental east-west artery through Texas, South Louisiana, across the Huey P. Long Mississippi River Bridge, through New Orleans and to the Eastern Seaboard beyond.

The elaborate and expensive traffic interchange plans to connect the Expressway into these busy nationwide arteries was, of course, no accidental coincidence. It was the very heart of a plan without which the project would have been a colossal boondoggling waste, would have failed in its intended purpose to alleviate increasing traffic chaos and, most likely, would not have attracted a single dollar of investor's capital. If the Expressway was to be a useful, efficient carrier of traffic, if it was to be feasible from an economic and financing point of view, it had to be a direct link in the established network of interstate arteries made up both of federally designated highways and principal state highways.

■ The purpose that the Expressway, on completion, would be such a link is established beyond contradiction. That it was to be sponsored by State and Parish governments in recognition of responsibilities resting upon them reasonably to supply the public facilities needed for the movement of today's flood of local, state, interstate and foreign commerce, and was to be paid for by users, without either of them making the common trek to Washington for the beguiling grant of federal aid, detracts not a whit from its status as an interstate facility. Public funds, State or Federal, are not essential to the creation of instrumentalities of interstate commerce, cf. Overstreet v. North Shore Corp., 318 U.S. 125, 63 S.Ct. 494, 87 L.Ed. 656; Walling v. McCrady Construction Co., D.C.Penn., 60 F.Supp. 243, affirmed 3 Cir., 156 F.2d 932, certiorari denied 329 U.S. 785, 67 S.Ct. 298, 91 L.Ed. 673.

The purpose was thus clear, and the expectation that it would be a useful improvement of interstate facilities was certainly equally well-founded. Whether, and to what extent, entirely *new* traffic might be generated (i.e., traffic not previously using any of the other routes to and from New Orleans) was perhaps uncertain in the expert opinions of the traffic consultants. But there was none either as to the probable minimum volume of use by accepted classifications of passenger, truck and bus traffic, or the substantial savings in time, mileage and money on typical journeys to and from the New Orleans area and points to the north, northeast and east which would attract a considerable portion of existing traffic. Equally uncontradicted is the position of New Orleans, one of the Nation's most efficient and thriving gateways to National and International trade. From the confluence of the vast interlacing inland waterways, a deepwater seaport with abounding facilities, a system of major railroads fanning out in all directions, and a network of connecting State and Federal highways, New Orleans has become a reminder that the American idea of dual sovereignty per-

vades our economic as well as political life. For to New Orleans, interstate and foreign commerce, vital to the economic prosperity of the area, is actively cultivated and needed facilities are established or sought. Highways leading into it are essential adjuncts whether they carry goods from other states or the rich harvest of Louisiana's agricultural and industrial produce destined for movement beyond.

Whether, prior to Vollmer, this project, physically isolated by considerable distance from the established facilities of which it was to be a functional part, would have been considered an improvement of an existing facility may have been open to considerable doubt, especially as to those within the geographical reach of our pronouncements, see Van Klaveren v. Killian-House Co., 5 Cir., 210 F.2d 510 (deemed overruled by the dissenters in Vollmer). But Vollmer does, we think, at least do this much: in the emphasis to be given "practical considerations" if it is plain that the project, when completed, is intended to and will serve as an important, definite addition to, or improvement of, existing identifiable instrumentalities and thus facilitate the flow of commerce, whether by savings in time, or distance, elimination of costly delays or obstacles, or by an infinite variety of other causes, then mere physical isolation, separation of the project from the point or points of its ultimate connection with existing facilities or the necessity for a *future* connection will not be decisive.

■ That it would be a link in the existing interstate system was indispensable to the planning, execution, financing and operation of this Expressway. Thus it was, within the teaching of Vollmer, "so directly and vitally related to the functioning of an instrumentality or facility of interstate commerce as to be, in practical effect, a part of it, rather than isolated local activity * * *," 349 U.S. at page 429, 75 S.Ct. at page 862, 99 L.Ed. at page 1200.

Those working on the actual construction of it were, then, under the Act.

### (b) Production of Materials Used in Construction of Causeway

■ Since, as we now hold, building the Causeway was Commerce, it follows, with no real opposition from the Employer, that workers producing materials (cement, concrete, piling, precast slabs, etc.) which went directly into its construction were engaged in "producing goods for commerce", Alstate Construction Co. v. Durkin, 345 U.S. 13, 73 S.Ct. 565, 97 L.Ed. 745; Thomas v. Hempt Bros., 345 U.S. 19, 73 S.Ct. 568, 97 L.Ed. 751; Mitchell v. Raines, 5 Cir., 238 F.2d 186, 188.

### (c) Construction of the Field Plant

■ Starting with the premise that ordinarily the construction of a plant which, when completed, is expected to manufacture goods a part of which are intended to move in interstate commerce, will not make such construction "commerce", Parham v. Austin Co., 5 Cir., 158 F.2d 566; McDaniel v. Brown & Root, Inc., 10 Cir., 172 F.2d 466; Kelly v. Ford, Bacon & Davis, 3 Cir., 162 F.2d 555; cf. Tobin v. Pennington-Winter Construction Co., 10 Cir., 198 F.2d 334, certiorari denied 345 U.S. 915, 73 S.Ct. 727, 97 L.Ed. 1349, and Murphey v. Reed, 335 U.S. 865, 69 S.Ct. 105, 93 L.Ed. 410, especially in light of footnote 2 in Mitchell v. Vollmer & Co., supra; and see, Wage and Hour Division Interpretative Bulletin No. 5 set forth dissent Mitchell v. Vollmer & Co., 349 U.S. 427, at page 433, 75 S.Ct. 860, at page 864, 99 L.Ed. 1196, at page 1202, the Employer insists that the workers (comprising, we understand, the majority of claimants here) who built the Lakeshore Plant to fabricate and produce materials needed and used in the Causeway construction were not covered.

We think that the workers were covered, not because such secondary, new construction comes automatically under the Vollmer tent for we decline, as before, Mitchell v. Hodges Contracting Company, 5 Cir., 238 F.2d 380, 384, the Secretary of Labor's entreaty to find in Vollmer the complete annihilation of all

jurisprudence concerning the status of plants under initial construction merely because the term "new construction" was used or was involved. Rather, it is because, having found that those in group (a) building the Bridge were covered, we hold here that those in (c) were, in effect, also building the Bridge.

This depends not on legal principles, but on uncontradicted facts concerning the nature of this project from an engineering and construction point of view. This was no simple case of a contractor deciding it was to his interest to erect a job site plant to produce materials which he might otherwise obtain on open market purchase or by subcontract. Here, there was a complex, integrated operation testing, but not overtaxing, the professional skill and ingenuity of those contractors (Brown & Root, Inc. and T. L. James & Co., Inc., as joint ventures under the name of Louisiana Bridge Co.) as they laid out and executed the plan of operations for the building of this Causeway.

For not only was it long—if not the longest—its basic design compelled a substantial and elaborate plant at lakeside without which this type of Bridge could not be built. This unique design was the use of prestressed concrete. This special technique, apparently a recent postwar development carried out under license from patent owners, required the centrifugal casting of cylindrical, concrete pilings combined into required rigid lengths by post-stressing and the monolithic casting of prestressed slab deck sections each weighing about 200 tons, approximately 56 feet in length and 33 feet in width.

The contract specifications required that the deck slab and its seven integral longitudinal beams be cast as a monolith, and that before the concrete was poured into the retractable forms, a series of 25 wire cables strung through the spaces in which the girder beams would be cast, were subjected, by special hydraulic jacks, to a tension pull of 160,000 psi. With the wires under the prestressing tension, the concrete was poured, and after the cast monolithic slab section was steam cured and allowed to harden to a specified standard, the ends of the wires to backing bars and the jacks were cut. Thus the section, when hardened, was reinforced by steel stressed to 160,000 psi.

The contract permitted, and for efficient operations the plant was set up after being approved by the owner's Project Engineer, so that eight of the deck slabs would be cast in one continuous operation. This required that facilities be available to permit the stringing and prestressing of the wires for each of the seven beams for the whole length of eight slabs (8 x 56 = 448 feet), plus the space between the ends of each, and the pouring of concrete in the sequence prescribed. After the concrete hardened to the Engineer's satisfaction, each slab was required to be moved, as a unit, onto a barge for transportation to the Bridge site in the Lake for hoisting into its resting place on the post-stressed, concrete, cylindrical piles.

Equally tremendous was the operation of casting the concerete piling (54" in diameter, approximately 16' in usual length, with a 4" wall). This included an assembly line preparation of reinforcing wire "cages," the insertion of removable rubber hoses to make the necessary holes, for post-stressing wires, the placement of them in cylindrical form, the centrifugal pouring of cement while the forms were horizontal, the steam curing and hardening of the concrete, and the preparation of piles sections for joinder by post-stressed wires. Several sections were butted end to end and steel wire cables run through the 12 holes cast around the circumference and, by an operation similar to the prestressed deck slabs, the wires were placed under a tension of 160,000 psi. While under this tension, a grouting cement was forced under pressure into the holes around the stressed wires and allowed to harden. When finally hardened, the wires were cut and the effect of the grout was to hold pile sections together under a tension of 160,000 psi. When completed these, too, were lifted by crane onto barges for

movement to the Bridge site where they were driven into the bed of the Lake.

In addition, cast with the reinforcing steel in the traditional way, but without pre or post-stress, were the solid concrete caps approximately 3½ feet by 3 feet by 32 feet on which, placed on top of the piles, the beams of the deck slab rested.

Since over 2,200 deck slabs and 4,400 full length piling were needed for the 24 miles of over-the-water roadway, the production of these, considering their size, weight, and nature, the long curing and hardening time, the exacting standards for the concrete hardening while the reinforcing steel wires were prestressed, had to be set up on a well-designed, integrated assembly line.

To produce and handle these huge, cumbersome casts as the contract specified, the plant had, of course, to be gigantic in size and cost. The details are unimportant, but we are informed that the plant site was established on a 40-acre shoreside tract purchased by the contractor near Mandeville. A channel for access to and from the Lake and a slip for handling barges was dredged, the spoil pumped onto the swampy site to raise its elevation over six feet, and hundreds of piling driven on which to construct concrete surfaces or to bear the heavy assembly line equipment for casting. Two main casting assembly lines, one for two sections of eight deck slabs each, the other for one such section and casting the caps were constructed with necessary rails for the movement of the concrete spreaders, screeders and finishers, the shifting of curing sheds and the movement of a twin rail overhead 200-ton gantry crane as it hoisted a finished slab from its form and carried it to a point over a barge moored in the slip on which it was lowered for transport to the Bridge site.

So vital was the actual process of making the stressed casts, that the contract required the attendance of the Engineer personally to observe the stressing and releasing of the wires and, after approval and installation of the contractor's proposed plant layout and sequence scheme for stressing, it forbade any changes without the Engineer's express permission.

Whether, as claimed by the Employer, it chose to install a plant designed and equipped as a permanent plant for future use after completion of the Bridge project, there can be no question whatsoever that this plant, or a similar lakeside one, was indispensable to performance of this construction contract. The only reason it was built where it was and when it was, was because of this contract. It was an integral part of the whole project, Bennett v. V. P. Loftis Co., 4 Cir., 167 F. 2d 286, at page 288; Mitchell v. Brown, 8 Cir., 224 F.2d 359, at page 365, certiorari denied 350 U.S. 875, 76 S.Ct. 119, 100 L.Ed. 773, and not the mere creation of a manufacturing plant from which goods would be shipped for later consumption. The decision to so build it that it would be no salvage loss and would have future utility attests only to the characteristic skill, efficiency, imaginative foresight, resourcefulness and enterprising courage of these two contractors.

Had the Bridge been a conventional one, constructing a superintendent's job site office, a watchman's shack, an aggregate hopper, or a vehicle lubricating pit would each have been a part of the main job even though preliminary to it and unseen or nonexistent in the final product. The immensity of this project, the complications brought on by its size, the millions of dollars expended, or the unique engineering methods prescribed does not alter the fact that, as a workman drove a pile on which to place the rail to rest the gantry crane to hoist the concrete deck slab, he was not building a plant— he was building a Causeway Bridge.

These workers in group (c) were therefore covered. And, for these reasons in addition to those discussed above, workers in group (b) were also covered.

### Good Faith Defense

The summary judgment for the Employer must be reversed and here ren-

dered for the plaintiffs and Interveners on coverage as to groups (a), (b) and (c). But there is yet left undetermined the amount of overtime due and whether, as alleged, the Employer, under Section 11, 29 U.S.C.A. § 260, shall be relieved of penalties because failure to pay, while mistaken, was a good faith misunderstanding of the law. The cause must therefore be remanded for such determinations.

Reversed and rendered in part. Reversed and remanded in part.