**UNITED STATES of America,**
**Plaintiff,**

v.

**NEWJER CONTRACTING COMPANY,**
**Inc., and Philip Freitag, Defendants.**

**Cr. No. 407–57.**

United States District Court
D. New Jersey.
March 25, 1958.

Chester A. Weidenburner, U. S. Atty., Newark, N. J., by John D. Wooley, Asst. U. S. Atty., Manasquan, N. J., for plaintiff, (Francis V. LaRuffa, Supervising Atty., Arthur M. Miller, Atty., U. S. Dept. of Labor, New York City, on the brief).

Morris Roth, by Joseph Stevens, New Brunswick, N. J., for defendants.

1. Section 202 of the Act is a declaration of policy, and is as follows:

"(a) The Congress finds that the existence, in industries engaged in commerce or in the production of goods for commerce, of labor conditions detrimental to the maintenance of the minimum standard of living necessary for health, efficiency, and general well-being of workers (1) causes commerce and the channels and instrumentalities of commerce to be used to spread and perpetuate such labor conditions among the workers of the several States; (2) burdens commerce and the free flow of goods in commerce; (3) constitutes an unfair method of competition in commerce; (4) leads to labor disputes burdening and obstructing commerce and the free flow of goods in commerce; and (5) interferes with the orderly and fair marketing of goods in commerce.

"(b) It is declared to be the policy of this chapter, through the exercise by Congress of its power to regulate commerce among the several States and with foreign nations, to correct and as rapidly as practicable to eliminate the conditions above referred to in such industries without substantially curtailing employment or earning power."

2. 29 U.S.C.A. § 207(a)
"Except as otherwise provided in this section, no employer shall employ any of his employees who is engaged in commerce or in the production of goods for commerce for a workweek longer than forty hours, unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed."

FORMAN, Chief Judge.

This is a motion by the defendants, Newjer Contracting Company, Inc., and its president, Philip Freitag, to dismiss an information filed against them in which they are charged with violating the Fair Labor Standards Act, 29 U.S. C.A. § 201 et seq.[1] Specifically, defendants are charged with violating Section 207(a)[2] and 215(a)(2),[3] applicable to compensation for hours worked in excess of a work-week of 40 hours, and Sections 211(c)[4] and 215(a)(5),[5] applicable to falsification of records, while engaged in construction work from August 26, 1954 to November 8, 1956, on portions of the Garden State Parkway in New Jersey,

3. 29 U.S.C.A. § 215(a) (2)
"(a) After the expiration of one hundred and twenty days from June 25, 1938, it shall be unlawful for any person—

*       *       *       *       *

"(2) to violate any of the provisions of section 206 or section 207 of this title, or any of the provisions of any regulation or order of the Administrator issued under section 214 of this title;"

4. 29 U.S.C.A. § 211(c)
"(c) Every employer subject to any provision of this chapter or of any order issued under this chapter shall make, keep, and preserve such records of the persons employed by him and of the wages, hours, and other conditions and practices of employment maintained by him, and shall preserve such records for such periods of time, and shall make such reports therefrom to the Administrator as he shall prescribe by regulation or order as necessary or appropriate for the enforcement of the provisions of this chapter or the regulations or orders thereunder."

5. 29 U.S.C.A. § 215(a) (5)
"(a) After the expiration of one hundred and twenty days from June 25, 1938, it shall be unlawful for any person—

*       *       *       *       *

"(5) to violate any of the provisions of section 211(c) of this title, or any regulation or order made or continued in effect under the provisions of section 211(d) of this title, or to make any statement, report, or record filed or kept pursuant to the provisions of such section or of any regulation or order thereunder knowing such statement, report, or record to be false in a material respect."

and the New York Thruway, each of which was designed as a high-speed super-highway.

The Parkway is a north-south 173 mile super-highway spanning the entire length of New Jersey, having a total of 84 interchanges with highways, many of which are interstate, and were in existence prior to its construction. With its direct connection with the New Jersey Turnpike it facilitates the flow of traffic to Delaware and points south, to Pennsylvania and points west, and to New York City on the east. To the north, it is a direct artery to the State of New York and a connecting artery to New England.

The Legislature of New Jersey, in creating the New Jersey Highway Authority (N.J.R.S. 27:12B–1 et seq., N.J. S.A.), stated its purpose as follows:

"In order to facilitate vehicular traffic and remove the present handicaps and hazards *on the congested highways in the State,* and to provide for the construction of modern express highways embodying every known safety device including center divisions, ample shoulder widths, long-sight distance, multiple lanes in each direction *and grade separations at all intersections with other highways and railroads,* the New Jersey Highway Authority (hereinafter created) is hereby authorized and empowered to acquire, construct, maintain, repair and operate highway projects (as hereinafter defined) at the locations hereinafter established and at such other locations as shall be established by law." (Emphasis supplied.) N.J.R.S. 27:12B–2, N.J.S.A.

The Legislature further declared that:

" * * * In the design, construction and operation of such project, it shall be the duty of the Authority, so far as may be deemed practicable by it and may be permitted by the terms of any agreement by it with the holders of its bonds or notes, to permit the largest possible toll-free use of the project by intracounty or short-haul traffic and provide the largest possible number of points of connection between public highways and the project consistent with safe and efficient use of such project and public highways and safe and economical construction and operation of the project on a self-supporting basis." (Emphasis supplied.) N.J.R.S. 27:12B–20, N.J.S.A.

No claim is made that the Garden State Parkway and the New York Thruway are distinguishable from each other so far as any factual matter bearing upon the legal question to be determined herein. For the purpose of this motion, therefore, a presentation of factors relevant to the construction of the Parkway shall be deemed equally applicable to the Thruway.

Defendants contend that they are excluded from the provisions of the Act because they were engaged in "new construction" wholly within a single state, on each of the projects in question, rather than in the repair or maintenance of existing facilities used in interstate commerce. Their position is that the "highest court in the land as well as the inferior Federal courts have ruled time and again that work on construction of a new facility wholly within a single state, even if when completed it will be used in interstate commerce, does not constitute work 'engaged in commerce' as used by the Fair Labor Standards Act," citing Murphey v. Reed, 1948, 335 U.S. 865, 69 S.Ct. 105, 93 L.Ed. 410; Van Klaveren v. Killian-House Co., 5 Cir., 1954, 210 F.2d 510, and others.

In support of its position the Government cites the case of Mitchell v. C. W. Vollmer & Co., 1955, 349 U.S. 427, 75 S.Ct. 860, 99 L.Ed. 1196. In that case employees of the defendant company performed work in the construction of an earthwork embankment and concrete platform for the Algiers Lock in Orleans Parish, Louisiana, a unit in the Gulf Intracoastal Waterway, extending from Florida to the Mexican border. The Algiers Lock was designed to furnish bet-

ter passage into and across the Mississippi River than was provided by the then present Harvey Lock and Canal. The defense was that the employees working on the Algiers Lock were not engaged in interstate commerce and thus were not covered by the Act. The Court speaking through Mr. Justice Douglas commented upon the issue as follows:

"Section 7 of the Act makes the 40-hour week and the overtime provisions applicable to the Algiers Lock and Canal project if the respondent's employees at work on it are 'engaged in commerce.' It is argued that they are not engaged 'in commerce' since the Algiers Lock is new construction and therefore in the category of the new tunnel that was being constructed in Raymond v. Chicago, M. & St. P. R. Co., supra [243 U.S. 43, 37 S.Ct. 268, 61 L.Ed. 583]. In the latter case, the Court held that an employee at work on a new tunnel for an interstate carrier was not subject to the Federal Employers' Liability Act, 45 U.S. C.A. § 51 et seq., even though the tunnel, when completed, would be an interstate facility.

"We do not think that case should control this one. We are dealing with a different Act of another vintage—one that has been given a liberal construction from Kirschbaum Co. v. Walling, 316 U.S. 517, 62 S.Ct. 1116, 86 L.Ed. 1638, to Alstate Construction Co. v. Durkin, 345 U.S. 13, 73 S.Ct. 565, 97 L.Ed. 745. The question whether an employee is engaged 'in commerce' within the meaning of the present Act is determined by practical considerations, not by technical conceptions. See Walling v. Jacksonville Paper Co., 317 U.S. 564, 570, 63 S.Ct. 332, 336, 87 L.Ed. 460; Overstreet v. North Shore Corp., 318 U.S. 125, 128, 130, 63 S.Ct. 494, 496, 497, 87 L.Ed. 656. The test is whether the work is so directly and vitally related to the functioning of an instrumentality or facility of interstate commerce as to be, in practical effect, a part of it, rather than isolated local activity. See McLeod v. Threlkeld, 319 U.S. 491, 497, 63 S.Ct. 1248, 1251, 87 L.Ed. 1538." 349 U.S. at page 429, 75 S.Ct. at page 862.

* * *

"The Gulf Intracoastal Waterway is an existing instrumentality of commerce. Without Algiers Lock, it has proved inadequate where it crosses the Mississippi. Harvey Lock cannot handle the traffic. Use of Harvey Lock entails travel through some five miles of the New Orleans harbor, already heavy with traffic. It is impractical to widen Harvey Lock because it is located in a highly developed industrial section of New Orleans. *Algiers Lock is conceived as the practical alternative for relieving the congestion of the Waterway at this point.* See S.Doc. No. 188, 78th Cong., 2d Sess., pp. 1–4. The work on Algiers Lock seems to us to have as intimate a relation to improvement of navigation on the Waterway as the dredging of Harvey Lock would have. *It is part of the redesigning of an existing facility of interstate commerce.* Those working on the Algiers Lock are therefore 'engaged in commerce' within the meaning of § 7 of the Act." (Emphasis supplied.) 349 U.S. at page 430, 75 S.Ct. at page 862.

The Court pointedly emphasized the holding in Vollmer by the following language in Southern Pacific Co. v. Gileo, 1956, 351 U.S. 493, 500, 76 S.Ct. 952, 957, 100 L.Ed. 1357, a Federal Employers' Liability Act case, wherein it was stated:

"This Court recently rejected the 'new construction' doctrine in determining whether an employee is 'engaged in commerce' within the meaning of a like provision in the Fair Labor Standards Act, 29 U.S.C.A. § 201 et seq. Mitchell v. C. W.

Vollmer & Co., 349 U.S. 427, 75 S.Ct. 860, 861, 99 L.Ed. 1196."

Despite the contention of defendants that the Court's rejection of the "new construction" doctrine in Vollmer and Gileo was only dicta, and their other arguments, I am persuaded that their holdings plainly foreclose the defendants from the insulation they seek under the doctrine.

■ ■ The Court has made it clear that the question of whether an employee is engaged "in commerce" is to be "determined by practical considerations, not technical conceptions" under the Fair Labor Standards Act. The application of the principles laid down in Vollmer to the facts in this case produce a hand in glove fit. Just as with the Gulf Intracoastal Waterway in the Vollmer case, the system of interstate highways of New Jersey prior to the construction of the Garden State Parkway, as it is developed in this case, was an "existing instrumentality of commerce". Without the Parkway, the existing net work of New Jersey roads "proved [as] inadequate" in handling the constantly increasing flow of interstate traffic as did the Waterway without the Algiers Lock. Use of the prior existing roads of New Jersey entailed travel through numerous communities, already "heavy with traffic" as was New Orleans Harbor. Widening of the existing facilities in New Jersey would have been as "impractical" as that of widening Harvey Lock. The Parkway, like Algiers Lock, therefore, was "conceived as the practical alternative for relieving the congestion." And the Parkway, as in the instance of the Algiers Lock is "part of the re-designing of an existing facility of interstate commerce."

Those working on it, as those working on Algiers Lock, must be viewed as "engaged in commerce", since they performed work "so directly and vitally related to" interstate commerce "as to be, in practical effect, a part of it", as stated in the Vollmer case.

The analogy of the Vollmer case to the case at bar appears to be accurate and complete and its decision governs here. Hence, the motion by the defendants to dismiss the information will be denied and an order in conformity herewith should be submitted by the plaintiff with consent as to form, or it should be noticed for settlement.