UNITED STATES of America

v.

Nicholas A. STIRONE, Appellant.

No. 12543.

United States Court of Appeals Third Circuit.

Argued Sept. 18, 1958.

Decided Dec. 9, 1958.

Rehearing Denied Jan. 27, 1959.

Vincent M. Casey, Pittsburgh, Pa., Michael vonMoschzisker, Philadelphia, Pa. (Margiotti & Casey, V. J. Rich, Pittsburgh, Pa., on the brief), for appellant.

Hubert I. Teitelbaum, U. S. Atty., Pittsburgh, Pa. (Leonard J. Paletta, Asst. U. S. Atty., Western Dist. of Pa., Pittsburgh, Pa., on the brief), for appellee.

Before GOODRICH, STALEY and HASTIE, Circuit Judges.

GOODRICH, Circuit Judge.

This is an appeal from a judgment of conviction rendered in the Western District of Pennsylvania in a prosecution under the Hobbs Act, 18 U.S.C. § 1951. That statute penalizes anyone who "in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion * * *." [1] Extortion is defined as "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear * * *." [2]

The verdict of the jury came following a long, hard fought trial. Defendant, in this appeal, raises many questions which he claims were incorrectly decided by the district court whose careful and thorough opinion may be found in D.C.W.D.Pa.1957, 168 F.Supp. 490.

Defendant, a labor union official, was alleged to have extorted money from a man named William G. Rider who was in the business of supplying ready-mixed concrete. The Government's version of the facts, accepted by the jury, was that the defendant had come to Rider, following Rider's entering into a profitable contract to supply mixed concrete for the construction of a steel mill in Allenport, Pennsylvania, and that he had threatened Rider with the loss of that contract if he did not give the defendant fifty cents a cubic yard for all concrete furnished for this job. The sufficiency of this recital to justify conviction under the statute will be considered later. Defendant's first contention is that interstate commerce was in no way affected by his actions.

I. Interstate Commerce.

■ The interstate commerce question is simpler than the defendant's argument would have it appear. In making this ready-mixed concrete Rider bought sand which was pumped out of the Ohio River in Ohio, West Virginia or both. The Duquesne Sand Company, which pumped the sand from the river, sold it to Duquesne Slag Products Company. It was on Slag Products Company's land that Rider's operations for the contract mentioned were being carried on. It is sufficient to point out, to settle this part of the case, that some of the barges of sand were brought into Pennsylvania, consigned to Rider and unloaded by him at the place where his work was being carried on. This sand came from outside Pennsylvania. Whether it was consigned directly to Rider or was consigned to Duquesne Slag but delivered to Rider does not

---

1. 18 U.S.C. § 1951(a) (1951).

2. 18 U.S.C. § 1951(b) (2) (1951).

matter. There was interstate commerce in the process.

It is not necessary that this should have been the progress of all the sand; it is enough that there was evidence that a considerable quantity was sent to Rider in this way. We do not need to worry ourselves with the problem of material having come to rest from an interstate commerce journey and then having something else done to it after it has reached its destination. The facts, as to some of this sand at any rate, are as clear as if a Philadelphia baking concern, through a broker, ordered flour to be shipped from Minneapolis to him at Philadelphia. Hulahan v. United States, 8 Cir., 1954, 214 F.2d 441, is in point here; likewise its predecessor, Nick v. United States, 8 Cir., 1941, 122 F.2d 660, 138 A.L.R. 791. See National Labor Relations Board v. International Rice Milling Co., Inc., 1951, 341 U.S. 665, 71 S.Ct. 961, 95 L.Ed. 1277.

So far, so good; interstate commerce was involved in the delivery of this sand to Rider and if such commerce was affected by extortion on the part of the defendant there is an offense committed under the Hobbs Act.

■ There is another phase of the interstate commerce point, however, which presents more difficulty. The second paragraph of the indictment charged that Rider was a party to a contract "for the erection of a steel processing plant at Allenport, Pennsylvania, and, for the purpose of performing said contract, caused supplies and materials to move in interstate commerce between various points in the United States and the site of his plant for the manufacture of the mixing of ready mixed concrete. * * *" The connection of this charge with the facts shown about the shipment of the sand has already been discussed.

During the course of the trial a witness from the steel company whose plant was being built at Allenport gave evidence that when the steel mill was completed it would ship much of its product out of the state of Pennsylvania, notably to Michigan and Kentucky. The court, in its charge, told the jury that if it was satisfied "that Mr. Rider's concrete was used for constructing a mill which would manufacture articles of steel to be shipped in interstate commerce" and if they believed the defendant extorted money from Mr. Rider they were instructed "as a matter of law that there has been a substantial effect on interstate commerce shown by the United States."

There are two questions raised by this. The first has to do with whether the indictment covers this phase of the alleged crime and whether, if not, there is a fatal variance between indictment and proof. As said above, the indictment charged interference with interstate commerce on the receiving, not the sending end, except by stating that the sand was for a steel mill.

If there was a variance, no harm was done by it and it is not a source of reversible error. The defendant was not surprised; the testimony about the destination of the product of the mill was objected to, but counsel's argument against it was directed to the substantive law concerning the scope of interstate commerce. The record discloses that counsel was prepared for the introduction of the testimony rather than surprised by it. It is now too late to raise the point. See the discussion in Berger v. United States. 1935, 295 U.S. 78, 55 S.Ct. 629, 79 L.Ed. 1314.

■ The second question under this head is the correctness of the charge as a matter of substantive law. Is an interference with a man who is furnishing material for a mill which, when completed, will manufacture products which, if successfully marketed, will be shipped out of the state close enough to interstate commerce to be made a federal offense? It is to be noted that the language used in the statute is very broad,

seemingly intended to cover all that federal legislation can cover in this regard.[3]

We find a helpful authority in Mitchell v. C. W. Vollmer & Co., Inc., 1955, 349 U.S. 427, 75 S.Ct. 860, 99 L.Ed. 1196. There employees engaged in construction of a lock which, when completed, was to be part of the Gulf Intercoastal Waterway, were held to be engaged in commerce within the meaning of the Fair Labor Standards Act, 29 U.S.C.A. § 201 et seq. While the lock, when done, was to become an instrumentality of commerce, while it was in the process of construction it was as much in the preparatory stage as the steel mill here. And in Reed v. Pennsylvania Railroad Co., 1956, 351 U.S. 502, 76 S.Ct. 958, 100 L.Ed. 1366, the Supreme Court, reversing our decision in 3 Cir., 227 F.2d 810, held that the Federal Employers' Liability Act, 45 U.S.C.A. § 51 et seq., applied to an office worker whose duties were to file tracings of the company's rolling stock, equipment and structures. The Vollmer decision was held by the Fifth Circuit last year to include within "interstate commerce" the building of a causeway over which interstate traffic would flow when it was completed. Archer v. Brown & Root, Inc., 5 Cir., 1957, 241 F.2d 663. The decision also brought within "interstate commerce" the production of material for the causeway construction and the construction of a plant which when completed would produce materials to be used in the causeway construction. The only difference between this last aspect of the Archer case, supra, and the case at bar is that in the case at bar the plant, when completed, will produce materials which themselves will move in interstate commerce, whereas the material to be produced by the plant in Archer would be used for further construction. On principle the cases are indistinguishable.

The court in Archer declined to state whether it thought that Vollmer had swept away all the prior learning on the question of what touched or concerned interstate commerce sufficiently to be made the subject of federal regulation. See also Mitchell v. Hodges Contracting Co., 5 Cir., 1956, 238 F.2d 380. Nor do we here. It is sufficient that we think to apply the federal regulation to the case in hand is within current authorities.[4]

## II. Sufficiency of the Evidence.

We now turn to the defendant's contention that the evidence was insufficient to sustain a conviction. This point we can dispose of very quickly. The testimony of Rider and Mrs. Rider, if believed, is sufficient to support a finding that Rider was forced to pay this money to Stirone through fear of economic loss to his profitable business with the company constructing the steel mill. It is true that argument could be made to the contrary. But the argument to the contrary was made to the jury. Indeed, defendant denied that he was at the place where Rider said he was on the day of the alleged conversation and denied that the conversation ever took place. All this, however, is settled by the finding of the jury and that finding is amply supported in the testimony. Reasonable fear of economic loss is enough

---

3. See 18 U.S.C. § 1951(b) (3) (1951). "The term 'commerce' means * * * and all other commerce over which the United States has jurisdiction."

4. In Mitchell v. Hodges Contracting Co., 1956, 238 F.2d 380, the Fifth Circuit brought within the ambit of the Fair Labor Standards Act employees engaged in the construction of a new radio-television building for a local newspaper. Although television was a new enterprise for the newspaper, it previously had operated a radio station. The court, in applying the Fair Labor Standards Act to the construction, stated that the prior existence of the radio station removed it from "any status of naked 'new' construction for an activity not yet in being." 238 F.2d at page 384. See also United States v. Newjer Contracting Co., D.C.D.N.J.1958, 161 F.Supp. 867, in which the court held that employees of a construction company engaged in construction work on a super highway which when completed would facilitate the flow of traffic to other states were within the Fair Labor Standards Act.

to come within the statute. Bianchi v. United States, 8 Cir., 1955, 219 F.2d 182, 194.

### III. Evidence of Similar Offenses.

■ The prosecution, over objection, was permitted in rebuttal to introduce testimony of similar offenses by the defendant. These extortions, or coerced payments of money, if they took place, occurred following the incident of which Rider complains. This testimony had been offered in the Government's case in chief but the trial judge refused it. Later it was received as showing intent, scheme, plan or design.

The question of the admissibility of evidence of offenses other than the one for which the defendant is on trial is a very difficult one. Contradictory statements abound in the decisions and the judicial crop has been subjected to severe criticism by writers of law review articles.[5] The difficulty is one which is inherent in the nature of the problem.[6] Anyone obligated to determine the guilt or innocence of a defendant charged with a particular crime invariably would be influenced by a showing that the defendant commits crimes in general. Certainly it is probative to prove that a defendant in a criminal case is a man who commits crimes. This showing is strengthened by evidence that he has committed other crimes similar to the one with which he is now charged. The trouble is that while such evidence is probative it is highly prejudicial and a court or jury may find itself determining in general whether the defendant is a bad man rather than whether he committed a particular crime.

■ So, the general rule, as stated by most courts, is that evidence of other offenses is inadmissible in a criminal prosecution for a particular crime. This rule is qualified by a number of exceptions [7] stated in terms of the capacity of the evidence to prove some specific fact or issue such as intent, plan, scheme or design. E. g., United States v. Klass, 3 Cir., 1948, 166 F.2d 373, 377; United States v. Bradley, 3 Cir., 1945, 152 F.2d 425. But since the range of relevancy, other than for the purpose of showing criminal propensity, is almost infinite,[8] we think the rule may be phrased a little less mechanically. Evidence of other offenses may be received if relevant for any purpose other than to show a mere propensity or disposition on the part of the defendant to commit the crime.[9]

■ Of course the trial judge may, in the exercise of his sound discretion, exclude evidence which is logically relevant to an issue other than propensity, if he finds that the probative value of such evidence is substantially out-

5. The following articles contain a careful consideration of the problems in this area. Stone, The Rule of Exclusion of Similar Fact Evidence: England, 46 Harv.L.Rev. 954 (1933); Stone, The Rule of Exclusion of Similar Fact Evidence: America, 51 Harv.L.Rev. 988 (1938).

6. "It is hopeless to attempt to reconcile the precedents under the various heads; for too much depends on the tendency of the Court in dealing with a flexible principle." 2 Wigmore, Evidence § 302 at 201 (3d ed. 1940).

7. McCormick, Evidence § 127 at 328–31 (1954). See Note, 29 Mich.L.Rev. 473 (1931).

8. Id. at 327.

9. Even this general statement must be qualified in prosecutions for sex offenses. A number of jurisdictions admit evidence of other similar offenses where offered to prove propensity for illicit sexual relations with a particular person. E. g., Hodge v. United States, 1942, 75 U.S. App.D.C. 332, 126 F.2d 849 (incest); State v. Terry, 1925, 199 Iowa 1221, 203 N.W. 232 (incest); Sykes v. State, 1904, 112 Tenn. 572, 82 S.W. 185 (statutory rape). An extensive annotation on the subject is contained in 167 A.L.R. 565. A few decisions have admitted evidence of sex crimes with persons other than the particular person involved in the crime on trial. Compare Fairbanks v. United States, 1955, 96 U.S.App.D.C. 345, 226 F.2d 251, with Commonwealth v. Kline, 1949, 361 Pa. 434, 65 A.2d 348.

weighed by the risk that its admission will create a substantial danger of undue prejudice. United States v. Feldman, 2 Cir., 1943, 136 F.2d 394, 399; United States v. Shurtleff, 2 Cir., 1930, 43 F.2d 944, 947–948. See Uniform Rules of Evidence 55, 45; Model Code of Evidence Rule 303 (1942). But it must be borne in mind that the greater the probative force of the evidence, the more likely it is to be prejudicial to the party against whom it is offered.

In this case we think that there was no abuse of discretion in receiving the testimony. Rider testified that the defendant had interviewed him at his place of business on a certain date and that the defendant had threatened him with labor trouble if he did not make payments to the defendant. Stirone denied this meeting at the time and place specified but he admitted having collected money from Rider which he said was a fair and legitimate commission for services rendered in securing for Rider a profitable contract. The defendant argues that if Rider's testimony is believed the nature of the relationship between the defendant and Rider was proved and this other evidence was unnecessary. But the question before the jury was whether Rider's story was to be believed or not, the defendant having vehemently denied it. The evidence in question was, therefore, relevant to explain Stirone's purpose or intent in soliciting money from Rider. See United States v. Blount, 2 Cir., 1956, 229 F.2d 669, 671–672; United States v. Wall, 7 Cir., 1955, 225 F.2d 905.

The trial judge limited this evidence very strictly. He cautioned the jury "that the fact that the defendant may have committed another similar act is not of itself any evidence that he is guilty of the offense charged in the indictment." He told the jurors that before they could consider this testimony they must first find "that the other evidence in the case, standing alone, establishes beyond a reasonable doubt the accused did the particular acts charged in the indictment." Then he limited consideration of the testimony to showing intent, plan or scheme.

If the limitations given to the jury by the trial judge were more strict than he was required by law to make, that is, clearly, not a matter of which the defendant can complain.

## IV. Prejudicial Misconduct at The Trial.

The defendant complains of prejudice engendered at the trial by the prosecuting attorney. We do not find such prejudice. It was a very vigorously contested case. Lawyers for both sides "clash'd on their sounding shields the din of war." [10] Each side made charges against the witnesses for the other side. There was a suggestion that the prosecuting attorney injected his personal belief of the defendant's guilt into his argument. There is some talk which would perhaps support this contention. If there is any point to this, it was not timely made and so it does not need to be considered. We, of course, agree that the lawyer's own view as to the probity of witnesses or the soundness of a case is not something to be argued to the trier of the fact. We doubt, too, whether invectives thrown at witnesses for an opponent or at the lawyer for an opponent assist a jury to decide a case. But as we read through the record here we do not think that prejudicial error was committed although each counsel no doubt exasperated the other very much. The trial judge held the contestants in check calmly and his charge was a model of fairness. We think there is nothing to complain of in this department. As Judge Hand pointed out a number of years ago, Di Carlo v. United States, 2 Cir., 1925, 6 F.2d 364, 368, the prosecuting attorney may not be shorn "of all oratorical emphasis."

There is mention in the brief, though not an oral argument, of a complaint based on the circulation of a

10. Milton, Paradise Lost, Bk. I, 1. 668.

pamphlet for jurors. As pointed out by the trial judge, this objection was not timely made and need not be considered. There is, likewise, a complaint about the use of subpoenas by the Government. We find this trivial.

The judgment of the district court will be affirmed.

HASTIE, Circuit Judge (dissenting).

One of the principal questions in this case is whether the court below erred in charging the jury as follows:

"Or if you are satisfied beyond a reasonable doubt that Mr. Rider's concrete was used for constructing a mill which would manufacture articles of steel to be shipped in interstate commerce and if you also believe that the defendant extorted money from Mr. Rider, you are instructed as a matter of law that there has been a substantial effect on interstate commerce shown by the United States. In other words, if you find the facts to be as the Government contends, interstate commerce has been affected, obstructed and delayed."

Stating the issue thus raised this court asks:

"Is an interference with a man who is furnishing material for a mill which, when completed, will manufacture products which, if successfully marketed, will be shipped out of the state close enough to interstate commerce to be made a federal offense?"

To this question the majority give an affirmative answer. I regret that I am unable to concur.

It is recognized and agreed that the Hobbs Act, 18 U.S.C. § 1951, and the present indictment founded on that statute do not purport to make an extortionate demand upon a business proprietor a federal crime except upon a clear showing that such interference with the business in question actually "obstructs, delays or affects" interstate commerce or the movement of some article in such commerce. Cf. United States v. Employing Plasterers' Ass'n, 1954, 347 U.S. 186, 74 S.Ct. 452, 98 L.Ed. 618.

In some situations the business against which an extortionate demand has been made can be shown to be a part of or intimately related to interstate commerce so that any disruption of that business necessarily has significant effect upon commerce. Thus, and most obviously, if the business directly affected by an extortionate demand is interstate transportation the wrong is within the Act. E. g. United States v. Kemble, 3 Cir., 1952, 198 F.2d 889. Again, if extortion is directed against a proprietor engaged in providing, operating or otherwise working upon something so closely related to functioning interstate commerce as to merit characterization as a facility or instrumentality of such commerce, this in itself may be enough to bring extortion hampering that enterprise within the statute. Cf. Mitchell v. C. W. Vollmer & Co., 1955, 349 U.S. 427, 75 S.Ct. 860, 99 L.Ed. 1196; Oversheet v. North Shore Corp., 1943, 318 U.S. 125, 63 S.Ct. 494, 87 L.Ed. 656; Archer v. Brown & Root, Inc., 5 Cir., 1957, 241 F.2d 663.

But here the only commerce said to be affected is the prospective distribution of goods to be produced by a factory about to be constructed. I think it would be an unwarranted extension of the concept of wrongful conduct affecting interstate commerce to embrace this interference with the supplying of building material for a structure which will house an activity which will eventually create some new commerce. In other circumstances it has been thought essential to federal jurisdiction under the commerce clause that the regulated conduct be related to some existing commerce, and not solely to commerce contemplated or planned to have its beginning in the future. This view is exemplified and strongly supported by the cases, of which our own decision in Kelly v. Ford, Bacon & Davis, Inc., 3 Cir., 1947, 162 F.2d 555, is an often cited leader, refusing to extend the Fair La-

bor Standards Act conception of activity affecting the production of goods for commerce to the construction of new plants intended solely for the future production of goods for interstate distribution. The vitality of this concept is attested by Murphey v. Reed, 1948, 335 U.S. 865, 69 S.Ct. 105, 93 L.Ed. 410, and a comment on that decision in Mitchell v. C. W. Vollmer & Co. supra, 349 U.S. at 430, note 2, 75 S.Ct. at page 862. It seems to me that the special aversion of the criminal law for speculative conclusions in the chain of proof of guilt makes this limitation even more appropriate, indeed essential, in applying the Hobbs Act.

In addition to this difficulty of affecting commerce not yet begun, the present case presents a second speculative factor. The extortionate threat was made against a local supplier of mixed concrete. It is entirely speculative whether or not preventing this single materialman from furnishing mixed concrete on the construction job he was serving would have affected even future interstate commerce. Was concrete in abundant or short supply? Were there other materialmen ready and anxious to supply without delay the concrete needed for the job? The record tells us nothing. But without some proof that the loss of this supplier would in fact have some delaying effect on the eventual productivity of the mill, any suggested ultimate effect even on interstate commerce several steps removed is speculative to an extreme degree. Cf. United States v. Starlite Drive-In, Inc., 7 Cir., 1953, 204 F.2d 419. Indeed, I understand the authoritative rule to be that where the conduct in question is an interference with a distinct solely local business, there must be a substantial resultant demonstrable effect, the very antithesis of a speculative effect, upon interstate commerce to justify federal intervention under the commerce power. Mandeville Island Farms, Inc., v. American Crystal Sugar Co., 1948, 334 U.S. 219, 68 S.Ct. 996, 92 L.Ed. 1328; Wickard v. Filburn, 1942, 317 U.S. 111, 63

S.Ct. 82, 87 L.Ed. 122; United States v. Wrightwood Dairy Co., 1942, 315 U.S. 110, 62 S.Ct. 523, 86 L.Ed. 726. It is true that "[i]f it is interstate commerce that feels the pinch, it does not matter how local the operation which applies the squeeze." See United States v. Women's Sportswear Mfgs. Ass'n, 1949, 336 U.S. 460, 464, 69 S.Ct. 714, 716, 93 L.Ed. 805. But this figure of speech carries with it the idea that the "squeeze" must be real and the "pinch" uncomfortably perceptible.

On the present record no more can be said than that what was done to an entirely local business might conceivably have future impact on commerce. Most certainly not even a likelihood of actual impact upon interstate commerce can properly be said to have been proved beyond reasonable doubt. Yet that at least was the burden the government undertook to bear in this criminal case.

Finally, it should be considered and kept in mind that the control and punishment of local extortion is primarily the business of local or state government. The Hobbs Act is an auxiliary and partially duplicating federal superimposition on state law enforcement. In the view of Congress this is a desirable measure of federal assistance to the states in the exercise of their police power. But where state power and responsibility are thus primary and the national government is merely performing an auxiliary function, we should not be eager to stretch federal jurisdiction to cover doubtful cases offering only a tenuous or speculative theory of federal jurisdiction. See Schwartz, Federal Criminal Jurisdiction and Prosecutors' Discretion, 1948, 13 Law and Contemporary Problems, 64, 70. We should insist that federal jurisdiction be clear before imposing federal sanctions in an area of primarily local concern. Federal jurisdiction is certainly far from clear in the circumstances we are now considering.

What has been said in this dissenting opinion concerns only one of the two bases upon which the jury could have found the essential effect upon inter-

state commerce under the court's charge. We cannot know upon which theory the jury proceeded in finding the accused guilty. Therefore, I would send this case back to the district court for a new trial at which the erroneous theory of involvement of interstate commerce would be eliminated.

### On Petition for Rehearing

Before BIGGS, Chief Judge, and GOODRICH, McLAUGHLIN, STALEY and HASTIE, Circuit Judges.

PER CURIAM.

A petition for rehearing is presented for our consideration. The grounds urged therein have been fully argued to this court. We find no merit therein that would warrant a rehearing. Accordingly it will be denied.

BIGGS, Chief Judge, dissenting.

A fatal variance appears between the charge of the indictment and the proof. This court held correctly that the indictment charged Stirone with obstructing the receipt of sand at Rider's plant but concluded that it was not error for the trial court to have charged that the interference with interstate commerce prohibited by the Hobbs Act, 18 U.S.C. § 1951, could be found either on the basis of interference with the receipt of the sand or on the ground of obstruction with the shipping of steel from the Allenport plant of the Pittsburgh Steel Company which was in course of construction. Stirone was therefore tried on two charges. One, obstruction of the receipt of sand, and two, interference with delivery of steel from a plant not yet built. The first charge was laid in the indictment. The second was not. The doctrine of Berger v. United States, 1935, 295 U.S. 78, 81, 55 S.Ct. 629, 79 L.Ed. 1314 cannot cure the error. It is clear in Berger that the crime for which Berger was convicted was within the words of the indictment, see 295 U.S. at pages 81–83, 55 S.Ct. at pages 630–

631; the objection here is that the allegations of the indictment do not charge the crime for which Stirone was convicted.

I am also in accord with the views expressed in Judge HASTIE'S dissenting opinion. The statute is extended unreasonably to embrace interference with prospective distribution of steel from a factory in course of construction. The Allenport plant of the Pittsburgh Steel Company is not and was not a facility in interstate commerce. Cf. Mitchell v. C. W. Vollmer & Co., 1955, 349 U.S. 427, 75 S.Ct. 860, 99 L.Ed. 1196; Archer v. Brown & Root, Inc., 5 Cir., 1957, 241 F.2d 663, 669.

Stirone preserved his rights by appropriate objections.

I therefore must respectfully dissent from the order of this court denying rehearing.

Judge HASTIE shares these views and joins in this dissent.