James P. MITCHELL, Secretary of Labor, United States Department of Labor, Appellant,

v.

EMPIRE GAS ENGINEERING COMPANY, Appellee.

No. 16785.

United States Court of Appeals Fifth Circuit.

June 30, 1958.

Bessie Margolin, Asst. Sol., Stuart Rothman, Sol., Harry M. Leet, Atty., Dept. of Labor, Washington, D. C., Beverley R. Worrell, Regional Atty., Birmingham, Ala., for appellant.

Thomas T. Purdom, Decatur, Ga., James C. Grizzard, Atlanta, Ga., Grant & Grizzard, Atlanta, Ga., of counsel, for appellee.

Before CAMERON, JONES and BROWN, Circuit Judges.

JONES, Circuit Judge.

Some of the facts presenting the controversy out of which this appeal arises are not in dispute. The Homestead Army Air Base at Homestead, Dade County, Florida, was constructed during World War II and was used by the Army during the war with aircraft flights between the field and other states and other countries. The base was damaged by a hurricane in September, 1945. In November, 1946, control of the Base was transferred to War Assets Administration. By deeds of August 26, 1947, and June 23, 1948, the property was conveyed to Dade County, Florida. By these deeds it was provided that the Base should "be used for public airport purposes, and only for such purposes, on reasonable terms and without unjust discrimination and without grant or exercise of any exclusive right for use of the airport within the meaning of the Civil Aeronautics Act of 1938 [49 U.S.C.A. § 401 et seq.]." Near the end of 1952 or early in 1953, Dade County transferred the property back to the United States. The Base then became known as the Homestead Air Force Base. The conversion of the Base so that it could accommodate jet aircraft as well as propeller driven planes was undertaken. The Base became a part of the Strategic Air Command of the United States Air Force. The appellee, Empire Gas Engineering Company, contracted for the construction of jet bulk fuel storage tanks and fueling systems. These facilities would permit the rapid fueling of high speed planes designed for long range interstate and intercontinental flights. The facilities would provide for the loading of fuel

upon tanker planes for refueling of other planes in flight.

In a complaint filed by the Secretary of Labor against Empire in the district court for the Southern District of Florida, it was charged that Empire had violated Sections 7 and 15(a) (2) of the Fair Labor Standards Act of 1938, as amended. 29 U.S.C.A. § 201 et seq. Specifically, it was alleged that about eighty of Empire's construction employees, by reason of their activities, were engaged in commerce but had been employed for workweeks of more than forty hours without overtime compensation for the excess time. It was also averred that Empire had not kept and preserved the required records of time and pay of its employees. Empire contended in the district court, and renews its contentions here, (1) that the work was done under Government contracts on an instrumentality of war and hence was not commerce within the coverage of the Act, (2) that the contract work was new construction and was not the repair, maintenance or reconditioning of an existing commercial airport as an instrumentality of commerce, (3) that the provisions of the Eight Hour Law, 40 U.S.C.A. §§ 321, 325a, make inapplicable the overtime provisions of the Fair Labor Standards Act, and (4) that even if violations of the Act were established, no injunction should issue.

■■ The Secretary takes the position that the Powell case [1] is a complete answer to Empire's contention that because the air base was or was to become an instrument of war, it could not have been an instrumentality of commerce. The Powell case held that the manufacture of munitions for the United States in a Government owned plant under a contract with the Government is production of goods for commerce. Empire distinguishes the Powell case by pointing out that it had to do with production of goods for commerce and not with engaging in commerce. The purpose of the Act, as stated by the Court in the Powell

case, was not to regulate interstate commerce as such, but to eliminate, as rapidly as practicable, substandard labor conditions throughout the nation. The differences between production of goods for commerce and the engaging in commerce are not such as to exclude the latter from the rationale of the Powell decision. Cf. Alstate Construction Co. v. Durkin, 345 U.S. 13, 73 S.Ct. 565, 97 L.Ed. 745. An instrumentality of war is not, solely by reason of being such, excluded from being an instrumentality of commerce.

The district court made findings of fact in which were recited the diminishing uses of the property as an operating airport. A finding was made that by or during 1951 the property had been abandoned as an airport and no facilities were available for the repair, storage or servicing of aircraft. This led the district court to the conclusion that neither Empire nor its employees "were engaged in the extension, repair, maintenance, or reconditioning of an existing instrumentality of commerce, to wit a commercial public airport." This was followed by the court's conclusion that there had been no violation of the overtime provisions of the Act. The findings and conclusions are challenged by the Secretary. The evidence shows that during 1952 there were no airplanes regularly kept at the airport, yet there were 6000-foot runways which were usable and sometimes used. No regularly scheduled flights were made to or from the airport yet infrequent and intermittent landings and takeoffs were made by airplanes, some of which came from or took off for points beyond the State of Florida.

In December of 1952, the United States exercised its right of recapture of the premises and it was transferred to the United States by Dade County, Florida. In January of 1953 Air Force personnel took possession of the field and preparations were commenced for the doing of what might be required for mak-

1. Powell v. United States Cartridge Co., 339 U.S. 497, 70 S.Ct. 755, 94 L.Ed. 1017.

ing the airfield into a Strategic Air Command installation. During and after April of 1953 there were flights of Air Force planes to and from the airport which originated beyond Florida. The interstate activities and uses were something more than de minimis. The first of the Empire contracts was awarded on September 10, 1954, and the second on July 15, 1955. Work was commenced about October 14, 1954, on the first contract and about July 27, 1955, on the second contract.

The Act is to be given a liberal construction. Whether an employee is engaged "in commerce" within the meaning of the Act is determined by practical considerations, not by technical conceptions. The test is whether the work is so directly and vitally related to the functioning of an instrumentality or facility of interstate commerce as to be, in practical effect, a part of *it*, rather than isolated local activity. Mitchell v. Vollmer, 349 U.S. 427, 75 S.Ct. 860, 99 L.Ed. 1196. With respect to "engaging in commerce", the Supreme Court has said, "It is clear that the purpose of the Act was to extend federal control in this field throughout the farthest reaches of the channels of interstate commerce." Walling v. Jacksonville Paper Co., 317 U.S. 564, 63 S.Ct. 332, 335, 87 L.Ed. 460; Overstreet v. North Shore Corporation, 318 U.S. 125, 63 S.Ct. 494, 87 L.Ed. 656. The deepening of navigable waters and construction of retaining walls to provide harbor facilities for Naval vessels;[2] the putting in, for an interstate railroad, of foundation for a new signal tower, and the foundation and sub-flooring for a new maintenance building and storehouse;[3] the construction and repair of dikes and revetments on the Mississippi River;[4] the construction of new and relocated locks on the Gulf Intracoastal Waterway;[5] the construction of railway bridge abutments to replace abutments which have been washed out;[6] and the construction of a new causeway across Lake Pontchartrain which became a part of an interstate highway system;[7] have been held to be "commerce" within the meaning of the Act. The same determination has been made with respect to the reconstruction and extension of facilities of a naval air station. Laudadio v. White Construction Co., 2 Cir., 1947, 163 F.2d 383. See, also, Mitchell v. H. B. Zachry Co., D.C.N.M.1955, 127 F.Supp. 377. As in Archer v. Brown & Root, Inc., supra, so also here we do not need to determine whether the new construction doctrine has been repudiated. We have no difficulty in deciding that Empire and its construction employees were engaged in the repair, reconstruction and extension of an existing instrumentality of commerce and hence subject to the overtime provisions of the Act. The conclusion reached is not in conflict with Reed v. Murphey, 5 Cir., 1948, 168 F.2d 257, reversed in part Murphey v. Reed, 335 U.S. 865, 69 S.Ct. 105, 93 L.Ed. 410.

We think the contention of Empire that the provisions of the Eight Hour Law, 40 U.S.C.A. §§ 321, 325a, make inapplicable the overtime provisions of the Fair Labor Standards Act is fully answered by Powell v. United States Cartridge Co., supra. In the Powell case it was contended that where the Walsh-Healy Act[8] applied, it precluded the operation of the Fair Labor Standards Act. Both the Eight Hour

---

2. Ritch v. Puget Sound Bridge & Dredging Co., 9 Cir., 1946, 156 F.2d 334.

3. Walling v. McCrady Construction Co., 3 Cir., 1946, 156 F.2d 932, certiorari denied 329 U.S. 785, 67 S.Ct. 298, 91 L. Ed. 673.

4. Walling v. Patton-Tulley Transportation Co., 6 Cir., 1943, 134 F.2d 945.

5. Mitchell v. Vollmer, 349 U.S. 427, 75 S. Ct. 860, 99 L.Ed. 1196.

6. Fitzgerald Construction Co. v. Pedersen, 324 U.S. 720, 65 S.Ct. 892, 89 L.Ed. 1316.

7. Archer v. Brown & Root, Inc., 5 Cir., 1957, 241 F.2d 663, certiorari denied 355 U.S. 825, 78 S.Ct. 33, 2 L.Ed.2d 39.

8. 41 U.S.C.A. §§ 35–45.

Act and the Walsh-Healy Act relate to public contracts. Each contains a provision that no person shall be permitted to work more than eight hours a day. The Supreme Court decided that the application of the Walsh-Healy Act did not preclude the application of the Fair Labor Standards Act and that the two statutes are mutually supplementary rather than mutually exclusive. It follows that the same conclusion must be reached here.

At the trial the Secretary made an effort to show that, subsequent to the decision in Vollmer v. Mitchell, supra, an attorney who was experienced in the field of labor law should have been aware that the employment of construction workers engaged in performing the Empire contracts was subject to the overtime provisions of the Fair Labor Standards Act. What we have already said will indicate that a good faith conclusion could have been reached that the employees were not in commerce. The district court found that the Act did not apply. It would be difficult, under such circumstances, to question the court's determination that Empire acted in good faith upon the honest advice of able counsel in its failure to comply with the Act. The Secretary reminds us of the difficulties of enforcement and suggests that the district court failed, in denying an injunction, to recognize and discharge its duty to enforce the national policy as declared in the Act. Lenroot v. Kemp, 5 Cir., 1946, 153 F.2d 155. The Secretary believes that the opinion of this Court in Mitchell v. Hodges Contracting Co., 5 Cir., 1956, 238 F.2d 380, has been misconstrued and misapplied and has given rise to a misconception that good faith reliance upon advice of counsel is alone sufficient to justify the refusal to grant an injunction. We are asked to use this case as an appropriate occasion for further clarification of the countervailing considerations that may outweigh good faith reliance upon the advice of counsel.

It should not be forgotten that the issuance of injunctions in cases such as this is discretionary, as it is in most of the situations where this equitable remedy may be granted. Fleming v. Jacksonville Paper Co., 5 Cir., 1942, 128 F.2d 395, modified Walling v. Jacksonville Paper Co., 317 U.S. 564, 63 S.Ct. 332, 87 L.Ed. 460; Lenroot v. Kemp, supra; United States v. W. T. Grant Co., 345 U.S. 629, 73 S.Ct. 894, 97 L.Ed. 1303; Mitchell v. Hodges Contracting Co., supra; 31 Am.Jur. 929, Labor § 721. The Supreme Court has said:

> "The purpose of an injunction is to prevent future violations, Swift & Co. v. United States, 1928, 276 U.S. 311, 326, 48 S.Ct. 311, 314, 72 L.Ed. 587, and, of course, it can be utilized without a showing of past wrongs. But the moving party must satisfy the court that relief is needed. The necessary determination is that there exists some cognizable danger of recurrent violation, something more than the mere possibility which serves to keep the case alive. The chancellor's decision is based on all the circumstances; his discretion is necessarily broad and a strong showing of abuse must be made to reverse it." United States v. W. T. Grant Co., supra. [345 U.S. 629, 73 S.Ct. 898.]

Empire completed the contracts in October of 1956. The trial of the cause was completed on January 23, 1957. There is no showing that Empire has or is likely to have another such contract. Indeed the possibility of it having another contract where the factual situation is substantially the same seems highly remote. It was not intended that the criteria set forth in Mitchell v. Hodges Contracting Co., supra, should be all inclusive. On the contrary, the factors there enumerated were merely illustrative.

The good faith reliance upon advice of counsel as a factor in the denial of an injunction was, perhaps, overemphasized by the district court as a result of the stressing of this phase of

the question by counsel for both Empire and the Secretary. We find no abuse of discretion in the refusal of the district court to grant injunctive relief. Its judgment is

Affirmed.

CAMERON, Circuit Judge, concurs in the result.