James P. MITCHELL, Secretary of Labor, U. S. Department of Labor, Appellant,

v.

Clyde W. OWEN, an individual, d/b/a Clyde Owen Sand & Gravel Co., Appellee.

James P. MITCHELL, Secretary of Labor, U. S. Department of Labor,

v.

Clyde W. OWEN.

Nos. 14161–14163, 14223.

United States Court of Appeals Sixth Circuit.

June 30, 1961.

Robert E. Nagle, Dept. of Labor, Washington, D. C. (Harold C. Nystrom, Bessie Margolin, Washington, D. C., and Jeter S. Ray, Regional Atty., Nashville, Tenn., on the brief), for appellant.

Walter P. Armstrong, Jr., Memphis, Tenn. (of Armstrong, McCadden, Allen, Braden & Goodman), Memphis, Tenn., John Tipton (of Tipton & Tipton), Covington, Tenn., for appellee.

Before CECIL, WEICK and O'SULLIVAN, Circuit Judges.

O'SULLIVAN, Circuit Judge.

Appellee Owen, an individual engaged in the sand and gravel business in the State of Tennessee, was charged in the district court with violating the minimum wage, overtime compensation, and record keeping requirements of the Fair Labor Standards Act, 29 U.S.C.A. §§ 201–219. Owen, who employs some twenty workmen, mines, processes and sells sand, gravel and road gravel. His only place of business is located in Tennessee. All of his production activities take place in that state. All of such materials were sold, delivered and used in that state. The Secretary of Labor brought the four instant suits against Owen, alleging that Owen's employees were engaged in the production of goods for commerce within the meaning of Section 3(j) of the Fair Labor Standards Act, 29 U.S.C.A. § 203(j).

The facts which, according to the Secretary (and these facts are undisputed), give rise to coverage in Owen's case are these: Between October 22, 1956, and December 10, 1958,[1] Owen sold a total of 460,975.9 cubic yards of sand, gravel and road gravel. Of this total amount, approximately 22.6 percent was sold for use in various constructions at the Millington Naval Air Station. About one-fourth of this material was sold directly to contractors who were engaged in constructing taxiways and making runway repairs at the Air Station. The balance of the materials supplied by Owen for use at the Air Station was used for overlays on existing aircraft parking aprons and for the building of a parking area. The construction of these overlays and of the parking area was to be performed by Weymouth Construction Co. in four stages. To obtain the necessary sand and gravel for the performance of the first stage, Weymouth contracted directly with Owen, who delivered such material to the air base. For the other three stages, Weymouth contracted with John A. Denie's Sons Co., who in turn arranged with appellee to provide the materials needed. In accordance with this latter arrangement, Owen delivered 76,770.4 cubic yards of sand and gravel directly from Owen's pits to the Air Station in trucks hired by Owen. From May, 1957, to September, 1958, Owen delivered between ten thousand and thirteen thousand truck loads of material to the Air Station and billed Denie's $219,471.00 for such materials.

Apart from the material sold for use at the Air Station, Owen sold about 72,696 cubic yards of sand and gravel (approximately fifteen percent of his total production during the period here in question—note 1, supra) for use in several road and highway construction projects. Of this amount, 48,069.6 cubic yards were sold to contractors doing work on Tennessee state highways, 17,887 cubic yards to contractors working on "rural roads," and 6,739.4 cubic yards to the L & M Construction Co., which was used in the construction of bridges for a new southbound lane for U. S. Highway 51.

---

1. This period of time, although not coextensive with the times involved in each of the wage suits, encompasses all the periods involved in two of the wage suits, to wit: William Adcox, June 5, 1957— July 23, 1958; James Murphy, May 14, 1957—October 1, 1958; James T. Norris, Jr., October 9, 1957—September 10, 1958; and the major portion of the period involved in the third wage suit, Leo Cranthan, August 26, 1957—January 31, 1959.

Three of the four suits instituted by the Secretary were brought under Section 16(c) of the Act, 29 U.S.C.A. § 216 (c), to recover unpaid minimum wages and overtime compensation due four of Owen's employees. The other suit was brought pursuant to Section 17 of the Act, 29 U.S.C.A. § 217, to obtain injunctive relief restraining Owen from violating the Act in the future. In the district court, noncompliance with the Act's minimum wage, overtime and record keeping provisions was admitted. The correctness of the amounts claimed in the wage suits, provided coverage was found to exist, was also not disputed by Owen. The point of contest was whether Owen's employees were protected by the Act during the periods in question. Two of the wage suits (Nos. 14,162 and 14,163) were tried to a jury and resulted in judgments for Owen. In the injunction suit (No. 14,161) the district court denied the injunction sought and dismissed the complaint. The other wage suit (No. 14,223) was subsequently dismissed in summary judgment proceedings on the ground that the coverage issue had already been determined in favor of Owen in Cases 14,161, 14,162 and 14,163 and was *res adjudicata*.

Sections 6 and 7 of the Act, 29 U.S. C.A. §§ 206, 207, the minimum wage and overtime compensation provisions protect employees "engaged in commerce or in the production of goods for commerce." It is the "production of goods for commerce" category which concerns us here. That category embraces all employees engaged in "producing, manufacturing, mining, handling, transporting, or in any other manner working on such goods, or in any closely related process or occupation directly essential to the production thereof * * *." Fair Labor Standards Act, § 3(j), 29 U.S.C.A. § 203(j).

■ It is settled law that the production of materials for use in the improvement, extension, maintenance or repair of existing facilities or instrumentalities of interstate commerce constitutes the production of goods for com-

merce within the meaning of Section 3 (j) of the Act, 29 U.S.C.A. § 203(j). Alstate Construction Co. v. Durkin, 1953, 345 U.S. 13, 73 S.Ct. 565, 97 L.Ed. 745; Thomas v. Hempt Bros., 1953, 345 U.S. 19, 73 S.Ct. 568, 97 L.Ed. 751; Emulsified Asphalt Products Co. v. Mitchell, 6 Cir., 1955, 222 F.2d 913; Mitchell v. Hooper Equipment Co., 5 Cir., 1960, 279 F.2d 893; Mitchell v. Raines, 5 Cir., 1956, 238 F.2d 186; Compania de Ingenieros Y Contratistas, Inc., v. Goldberg, 1 Cir., 1961, 289 F.2d 78. The fact that Owen was an independent materialman who himself did no construction work is not significant here. Thomas v. Hempt Bros., 1953, 345 U.S. 19, 73 S.Ct. 568, 97 L.Ed. 751. It might be contended, however, with respect to the materials produced by Owen for use at the Air Station, that because he sold some of such materials to Denie's & Sons Co., who, in turn, sold them to Weymouth, the contractor working at the Air Station, Owen was insulated from the Act's coverage. Whatever validity this type argument may have in another case is vitiated here by the fact, apparent from the record, that from the moment of the first act of mining the sand and gravel until the delivery of the materials to the Air Station (in trucks hired by Owen) substantial portions of such production were intended for, and committed to, use in construction at the Air Station. See Mitchell v. Jaffe, 5 Cir., 1958, 261 F.2d 883.

■ That the production and the use of the materials both occur in the same state is of no legal consequence, if the materials were produced for use in work upon instrumentalities of commerce. Emulsified Asphalt Products Co. v. Mitchell, 6 Cir., 1955, 222 F.2d 913; Alstate Construction Co. v. Durkin, 1953, 345 U.S. 13, 73 S.Ct. 565, 97 L.Ed. 745; Archer v. Brown & Root, Inc., 5 Cir., 1957, 241 F.2d 663. The question first to be decided, therefore, is whether the Air Station and the various roads in which the sand and gravel were used are instrumentalities of interstate commerce.

Owen contends that although it is possible for a military installation, such as the Naval Air Station here involved, to become an instrumentality of commerce [see Powell v. United States Cartridge Co., 1949, 339 U.S. 497, 70 S. Ct. 755, 94 L.Ed. 1017] it can become so only if commercial transactions are involved in the interstate flights which admittedly take place daily to and from the Air Station. He insists that since no buying and selling of tickets or waybills is involved here, and since no "goods" as defined in Section 3(i) of the Act, 29 U.S.C.A. § 203(i), pass through the Air Station, the jury properly found that it was not an instrumentality of commerce. The mandate of the Supreme Court is that military air bases are facilities of commerce, "to the extent that interstate flights both land at and take off from them, and men, materials, and mail move through them from distant points." Mitchell v. Lublin, McGaughy & Associates, 1959, 358 U.S. 207, 213, 79 S.Ct. 260, 265, 3 L.Ed.2d 243. Since it is not disputed that interstate flights in fact take place to and from Millington Air Station and that on these flights men and cargo are transported across state lines, the Air Station, as a matter of law, is an instrumentality of commerce. We are of the opinion that the jury should have been so instructed, as requested by plaintiff. Plaintiff's request that the jury be told that the parking aprons, taxiways and runways of the Air Station were also instrumentalities of such commerce should have been granted. The decision of the Supreme Court in Mitchell v. Lublin, McGaughy & Associates, supra, makes it irrelevant that some of the materials which arrived at the Air Station were in the "actual physical possession of the ultimate consumer thereof." 29 U.S.C.A. § 203(i). That men, who clearly cannot come within the exclusionary clause of Section 3(i) of the Act [29 U.S.C.A. § 203(i)], were transported to and from the Air Station is sufficient. The district court's inclusion in his instructions of the substance of Section 3 (i) introduced an irrelevant subject, and

such an instruction should not have been given. See also this Court's decision in Chapman v. Home Ice Co., 6 Cir., 1943, 136 F.2d 353, 355.

Part of Owen's production was delivered to a job which involved the construction of bridges on a new traffic lane of U. S. Highway 51. Parts of such bridges were constructed on the existing highway right of way, and parts on a newly acquired right of way. The center of the road surface of these bridges was fifty-four feet from the center of the existing road. When completed, the roadway of which the bridges were a part was to be the south lane of the highway. It was conceded, and the court took judicial notice of the fact, that Highway 51 was an instrumentality of interstate commerce. Plaintiff requested the district judge to instruct the jury that Highway 51 was an instrumentality of interstate commerce, and that the new bridges and their road surfaces were, likewise, such instrumentalities. Such request was erroneously refused. Defendant contended that the work on such bridges was, "new construction" and, as such, was not upon an instrumentality of commerce. At defendant's request, the jury was instructed:

"Original construction upon land never before used as a highway does not fall within the definition of 'commerce' or the production of goods for commerce merely because eventually some interstate commerce will move upon it."

In the context of these cases, we consider that such instruction was inappropriate. The inflexible "new construction" rule was rejected by the Supreme Court in the case of Mitchell v. C. W. Vollmer & Co., 1955, 349 U.S. 427, 429, 75 S.Ct. 860, 99 L.Ed. 1196. See Mitchell v. H. B. Zachry Co., 1960, 362 U.S. 310, 313, 80 S.Ct. 739, 4 L.Ed.2d 753. In the Vollmer case, the court held that the construction of a new lock, where none was present before, for an existing waterway was "part of the redesigning of an existing facility of interstate commerce." 349 U.S. 427, 430, 75 S.Ct. 860,

862. We see no legally significant distinction between the improvement of the waterway system in Vollmer and the addition of a new lane to an existing interstate highway. The construction of this lane, and of the bridges for it, was "so directly and vitally related to the functioning of an instrumentality or facility of interstate commerce as to be, in practical effect, a part of it * * *." Mitchell v. C. W. Vollmer & Co., 1955, 349 U.S. 427, 429, 75 S.Ct. 860, 862, 99 L.Ed. 1196. See also Archer v. Brown & Root, Inc., 5 Cir., 1957, 241 F.2d 663; Mitchell v. Hodges Contracting Co., 5 Cir., 1956, 238 F.2d 380. Consequently, it was error to submit this question to the jury.

There was testimony at the trial that the state highways for which Owen supplied materials were used consistently by common carriers transporting goods to and from out of state destinations. This fact is sufficient to constitute these instrumentalities of interstate commerce. Overstreet v. North Shore Corp., 1943, 318 U.S. 125, 129, 63 S.Ct. 494, 87 L.Ed. 656; Emulsified Asphalt Products Co. v. Mitchell, 6 Cir., 1955, 222 F.2d 913.

The district court also gave the following instruction to the jury:

"The production and furnishings, within the state, of construction materials, such as sand, gravel, brick and other construction materials produced for general local use, is not covered even if the producer also supplies such materials to construction companies which use them within the state in the repair, maintenance or improvement of facilities for the production of goods for commerce. Employees of the materialman in such situation would not have such a close and immediate tie to the production of goods for commerce as to be considered 'closely related' and 'directly essential' to such production."

The language of this instruction was taken from an interpretative bulletin which had been issued by the Administrator of the Wage & Hour Division [29 C.F.R. § 776.27(a)(3)]. It was a correct statement of the law, but we are of the opinion that it was inapplicable to the facts in the cases on trial. Close reading of the bulletin will disclose its intention to cover a situation where the goods were delivered to a contractor repairing a facility which, in turn, was engaged "in the production of goods for commerce." The contractors carrying on construction at the Air Base and on interstate highways were not doing work on facilities which were producing goods for commerce, but were working directly on the instrumentalities of interstate commerce (see Mitchell v. H. B. Zachry Co., 362 U.S. 310, 80 S.Ct. 739, 4 L.Ed.2d 753). The situation involved in these cases is covered by subsection (d) of § 776.27 of such Interpretative Bulletin.

Defendant asserted that it was necessary for the plaintiff Secretary to establish that Owen had knowledge at the time of production that the materials produced were to be used in the repair, maintenance or construction of instrumentalities of interstate commerce. He asserts that there was no proof of such knowledge and, in any event, that the evidence made an issue as to such knowledge which was properly submitted to the jury.

Actual knowledge that the goods will be used in commerce is not necessary. All that is required is that at the time of production the producer has reason to anticipate that his goods will be so used. D. A. Schulte, Inc., v. Gangi, 1946, 328 U.S. 108, 121, 66 S.Ct. 925, 90 L.Ed. 1114; Tobin v. Celery City Printing Co., 5 Cir., 1952, 197 F.2d 228, 229. A mere disclaimer of actual knowledge of the goods ultimate use will not, alone, insulate the producer against application of the Act's provisions. Nor is it possible to avoid their application by ignoring the circumstances surrounding the production or by claiming ignorance of the nature of his business. Warren-Bradshaw Drilling Co. v. Hall, 1942, 317 U.S. 88, 93, 63 S.Ct. 125, 87 L.Ed. 83.

It was shown at the trial that Owen was in frequent contact with per-

sons connected with the projects concerning the materials which he was supplying; he had signed a contract with Weymouth Construction Co. to supply and deliver all of that contractor's sand and gravel requirements for the first increment of the Air Station job, which contract showed the nature of the construction there; he delivered over ten thousand truckloads of material to the Air Station. This testimony made it clear that Owen had reason to anticipate, and knew, that substantial amounts of the material being produced would be used in construction at the Air Station, which the evidence showed was an instrumentality of interstate commerce. The work on the Air Station job was done in four increments, extending over the period from May, 1957, into September, 1958. Owen's deliveries to this project covered all four increments of it. He testified that while he was producing sand and gravel for his stockpile, he did not know which parts of the whole pile would be used to fill particular orders and that he couldn't be sure that all of the material which he delivered to a stockpile at the Air Station would be used there. Such testimony would not permit him to escape being charged with knowledge that substantial parts of his production were, during the period in question, for commerce. We hold that reasonable minds could come to no other conclusion but that Owen knew that he was producing materials for the Air Station while that work was in progress.

"If he did not know, it was because he did not look, or looking, did not see, or want to see, what was so plainly there." Mitchell v. Raines, 5 Cir., 1956, 238 F.2d 186, 188.

The period of time during which the plaintiff claimed that defendant had failed to pay the required overtime and minimum wages extended from May 14, 1957, to October 1, 1958. There was no breakdown by weeks or months of the amounts claimed to be due, but there was evidence from which it could be found that production for commerce continued throughout the entire period. Defendant's answer to an interrogatory, introduced in evidence by plaintiff, asserted that there were no deliveries to the Air Base during the months of December, 1957, and January, February and March, 1958. From this, defendant argues that, there being no breakdown of the period involved, and a failure of proof as to a substantial part of such period, plaintiff's case failed in its entirety; and that the judgments in the wage suits tried should, for that reason alone, be affirmed.

It is well settled that it is the time of production of the goods, rather than the time of their use or delivery, which is controlling. D. A. Schulte Co. v. Gangi, 1946, 328 U.S. 108, 66 S.Ct. 925, 90 L.Ed. 1114. The mere fact that deliveries of the goods produced take place some time after their production is of no consequence when the goods produced were intended, at the time of their production, for interstate use or shipment. Mitchell v. Idaho Lumber Co., 9 Cir., 1955, 223 F.2d 836. Although there was no direct proof that the sand and gravel produced during the three month period (it is undisputed that production of such materials continued throughout this period) was intended for use in instrumentalities of interstate commerce, the circumstances of the case would, nevertheless, permit a finding that Owen's employees were engaged in the production of goods for commerce during the entire period involved. There was testimony introduced at the trial that as the sand and gravel was produced it was stockpiled against future orders. Further testimony showed that some of the deliveries made to the Air Station were made from such stockpiles. Coupled with this testimony, is the fact that during the three months in question Owen had a contract with John A. Denie's Co. to supply sand and gravel to the Air Station. This circumstantial evidence was sufficient to sustain the Secretary's initial burden of proof. The burden was then shifted to Owen to come forward with evidence concerning the nature of the work performed by his employees. Where the employees are engaged both

in interstate and intrastate production, it is incumbent upon the employer to introduce probative evidence distinguishing between the two operations. Guess v. Montague, 4 Cir., 1943, 140 F.2d 500, 504. See also, Anderson v. Mt. Clemens Pottery Co., 1946, 328 U.S. 680, 686, 66 S.Ct. 1187, 90 L.Ed. 1515. To hold otherwise would place upon the Secretary a burden of tracing goods from production to interstate commerce, a burden which is not contemplated by the Act. United States v. Darby, 1941, 312 U.S. 100, 657, 61 S.Ct. 451, 85 L.Ed. 609.

Plaintiff did not move for a directed verdict, nor for judgment notwithstanding the verdict. He had submitted a request for a peremptory instruction that the employees involved were covered by the Act and entitled to its benefits. He asks here for a new trial in all four cases. The judgments in the three wage cases, 14,162, 14,163 and 14,223, are reversed and new trials ordered. A new trial must, likewise, be granted in case No. 14,161, the injunction action. Ordinarily, the matter of granting an injunction in a Fair Labor Standards case is a discretionary act and not subject to our review in the absence of an abuse of such discretion. Walling v. Youngerman-Reynolds Hardware Co., Inc., 1945, 325 U.S. 419, 65 S.Ct. 1242, 89 L.Ed. 1705; Mitchell v. Empire Gas Engineering Co., 5 Cir., 1958, 256 F.2d 781. However, since the district court here predicated its order denying injunctive relief on the conclusion that Owen "was not engaged in the production for commerce within the meaning of the Fair Labor Standards Act, and, therefore, was not subject to the terms, provisions and requirements of said Act," the judgment in that case must be reversed and remanded for reconsideration in the light of this opinion.

The reversal of the judgments of the district court, in each of which defendant was awarded costs against plaintiff, makes it unnecessary at this time to consider the propriety of awarding costs against the Secretary of Labor in such actions as are involved in this litigation.