299 F.2d 297
 James P. MITCHELL, Secretary of Labor, United States Department of Labor (Arthur J. Goldberg, Secretary of Labor, substituted as party appellant in the place and stead of James P. Mitchell, Resigned), Appellant,
v.
BALLENGER PAVING COMPANY, Inc., Appellee.
 No. 18714.
 United States Court of Appeals Fifth Circuit.
 February 6, 1962.
 
 Bessie Margolin, Asst. Sol., Jacob I. Karro, Atty., Charles Donahue, Sol. of Labor, Isabelle R. Cappello, Atty., Dept. of Labor, Washington, D. C., Beverley R. Worrell, Regional Atty., Birmingham, Ala., for appellant.
 C. T. Wyche, Greenville, S. C., John Izard, Jr., Atlanta, Ga., John Izard Jr., Atlanta, Ga., and Spalding, Sibley, Troutman, Meadow & Smith, Atlanta, Ga., Wyche, Burgess & Wyche, Greenville, S. C., of counsel, for appellee.
 Before TUTTLE, Chief Judge, and CAMERON and BROWN, Circuit Judges.
 TUTTLE, Chief Judge.
 
 
 1
 The Secretary of Labor appeals from the denial by the trial court of an injunction against future violations of the Fair Labor Standards Act, 29 U.S.C.A. § 201 et seq.
 
 
 2
 The employer in this case is engaged in the paving contracting business. The violations giving rise to the litigation occurred principally out of contracts for the paving of facilities at military air bases. There were other violations that occurred during ordinary road paving jobs. The total amount of wages unpaid to employees which, under the concession finally made by the employer would have been due his employees if the Act had been complied with, is approximately $39,000. Of this amount about $2,400 represented unpaid wages on the road construction projects.
 
 
 3
 The employer originally defended the action on the ground that airport construction dealt with instrumentalities of war and was therefore not a part of commerce or the production of goods for commerce. The only reason given for failures to comply with respect to the road paving jobs was that these items were inadvertently overlooked because the contracts were with Army Engineers. The failure of compliance occurred continuously beginning four years prior to the date of trial, in March, 1955, down to April 23, 1959.
 
 
 4
 During the year 1955 the employer was advised by the Department of Labor that the Act was applicable to its military projects. Ballenger declined to comply, stating that he could not follow the department's reasoning, that none of his competitors were doing it, and stating further that he felt if the Act was supposed to apply it would have been written into the contract. On May 31, 1956, Ballenger's counsel wrote to the Department that "according to [his] information, there is no law requiring overtime compensation for hours worked in excess of forty in a work week to employees employed on air fields or similar military construction." On November 16, 1956, the Labor Department's Regional Attorney called counsel's attention to several cases, including Mitchell v. H. B. Zachry, 127 F.Supp. 377, a District Court decision exactly in point. Counsel replied, stating: "We feel that it is contrary to accepted law and we, of course, are not bound by it even if the factual situation were analogous." In May, 1957, defendant was advised by the Labor Advisor for the Corps of Engineers that it was a contractor's responsibilities to check with the Department of Labor as to coverage under the Fair Labor Standards Act. Twice in 1957 the employer was advised by a Labor Department representative that its air field operations were covered and that it was violating the Act in not complying with its terms. On October 18, 1957, this suit was filed.
 
 
 5
 On June 30, 1958, this Court decided the case of Mitchell v. Empire Gas Engineering Co., 5 Cir., 256 F.2d 781. In that case this Court expressly held that a contractor in the position of the appellee here was covered by the Fair Labor Standards Act. On or about January 23, 1959, in a conference between attorneys for the Secretary of Labor and counsel for the employer in the pending litigation, the Empire Gas Engineering Company case was called to the attention of employer's counsel. This was communicated to Ballenger's general counsel in Greenville, South Carolina, in a letter dated February 5, 1959. By a letter dated February 10th, the general counsel acknowledged receipt of this information, and stated: "It seems to me that the Empire Gas Engineering case is the coup de grace to our position." Then follows the following pertinent comment: "My present inclination is to now advise Ballenger that it must comply with the FLSA and see if we can get a dismissal without an injunction based on our agreement to so abide. If you agree with this, let me know and I will take it up with Ballenger to see what his reaction is." The record is silent as to any other intercounsel communications. However, it is not disputed that it was near the end of February before counsel actually notified Ballenger of his legal opinion. Even on this advice from counsel, Ballenger, without being advised to do so, still delayed compliance. The reason he gave was expressed in the following words:
 
 
 6
 "I felt like that the case might not have been a contested case; that Empire Gas worked a lot of union crafts in which they would have to pay time and a half over both eight and forty anyway, and I thought it was to our interest to find out whether or not that was a contested case."
 
 
 7
 Thus it is that even after Ballenger was informed by his lawyer that its operation was covered by the Act, the Company continued until April 23rd, or at least six weeks longer of illegally computed weekly payrolls before it came into compliance. The Government points to the further significant fact that the letter signifying compliance was sent out shortly after the secretary filed notice that depositions would be taken on April 29th, the week following Ballenger's ordered compliance.
 
 
 8
 In August, 1959, a pre-trial hearing was held and at that time the trial court in its pre-trial order stated: "The defendant concedes that a * * * decision by the Court of Appeals for the Fifth Circuit indicates that defendant has violated the Act. Defendant contends that said decision erroneously construes the Act." Thus, it appears that even at that time the employer was still reserving its argument to test coverage. However, by the time the case came on for trial, this position was finally abandoned and the trial turned solely on the question whether an injunction should issue. The critical findings of fact by the trial court were as follows:
 
 
 9
 2 — For several years prior to April, 1959, there existed in the mind of defendant and its executives, as to whether defendant's operations in connection with runways on military air bases came within the provisions of said Act. It was generally believed among such contractors that the Act did not apply and defendant company was so advised by able counsel. The belief that the Act did not apply was encouraged and fostered by other departments of the United States Government whose primary interest was not to enforce the Fair Labor Standards Act but to save as much money as possible in regard to such operations.[1]
 
 
 10
 3 — In July, 1958, the Fifth Circuit Court of Appeals decided the case of Mitchell v. Empire Gas Engineering Company, 256 F.2d 781, which put at rest the confusion above referred to. Defendant and its executives did not for a period of time get actual knowledge of this decision, there being testimony that it did not at once come to the attention of attorneys then representing defendant company, and even then that it was necessary for counsel to contact Empire Gas Engineering Company and ascertain the actual questions involved in the case. As stated above, this period of delay is the only factor or neglect upon the part of defendant company. However, this Court is accepting the sworn statement of the defendant company, its executives and the attorneys, all reputable men, to the above effect.
 
 
 11
 We are unable to find support for the findings of the trial court to the effect that the belief that the Act did not apply was encouraged and fostered by other departments of the United States Government. It is true that the paving contracts expressly included provisions that the terms of the Davis-Bacon Act and the eight-hour law were to be complied with. This followed simply because Federal statutes required that the contracts make specific reference to these acts. It is undisputed, however, that the employer was repeatedly told that the coverage under the wage and hour law was not passed upon by the contracting authority, but was referable to the Labor Department.
 
 
 12
 It is also plain that there is no actual evidence when the knowledge of Mitchell v. Empire Gas Engineering Company come to the attention of Ballenger's counsel. The only evidence is that it was called to their attention by the Wage and Hour attorneys on January 23, 1959. This was still not brought to the attention of Ballenger until the end of February and even then Ballenger declined to accept the opinion of his lawyer until he decided, without suggestion of his counsel, to satisfy himself that it was actually binding.
 
 
 13
 This court has recently had presented to it a number of appeals from the refusal of a trial court to grant an injunction where compliance has finally been conceded after substantial loss of wages to employees. In most of these cases, the argument is made that a good faith reliance on advice of counsel justifies the course of conduct followed by the employer and this factor looms large in the decision of the trial courts in denying an injunction.
 
 
 14
 Whereas we have recognized that an injunction does not follow as a matter of course upon either a finding or stipulation of violation of the act, Mitchell v. Hodges Contracting Co., 5th Cir., 283 F.2d 380 and Mitchell v. Strickland Transportation Co., 5th Cir., 267 F.2d 821, we have nevertheless not hesitated to reverse an order of the trial court denying an injunction when it is clear that its discretion resulting in a denial has not been exercised in the light of the objectives of the Act. As the years pass by and the Act and its coverage become more and more a part of employer-employee relations, we find it more frequently necessary to direct the entry of a decree of injunction on such appeals than has heretofore been the case. See Mitchell v. Hausman, 5th Cir., 261 F.2d 778 and Mitchell v. Blanchard, 5th Cir., 272 F.2d 574 and see especially Mitchell (Goldberg, Secretary of Labor) v. Pidcock, III, No. 18,687, 5th Cir., 299 F.2d 281, decided by this court on February 5, 1962.
 
 
 15
 This does not mean to say that each case must not still be determined on the basis of its own facts. It is to say, however, that the very apparent remedial purpose of this Act is too often overlooked where an employer has actually profited from his failure to comply with the law, and where his persistence in such failure, still to his profit, extends beyond the time when by all reason his doubts or uncertainties as to coverage should have vanished. This we think is such a case. Without in any way criticizing or modifying the trial court's determination of the high standing of the persons involved, we are nevertheless compelled to find that, under the circumstances of this case, the failure of Ballenger to pay the legally required wages for a period of more than nine months after this Court's decision in Empire Gas, at a time when it was conscious of constant demands by the Department of Labor that it come into compliance, and at a time when this precise point was being litigated, and which time involved three months after actual notice to its counsel and six weeks after actual notice and advice to its President, deprives it of any defense against the Government's claim that an injunction be issued.
 
 
 16
 Following the decision by the Supreme Court in Powell v. United States Cartridge Co. in 1950, 339 U.S. 497, 70 S.Ct. 755, 94 L.Ed. 1017, it was perfectly clear that the mere fact that the employment was in connection with national defense did not make the Fair Labor Standards Act inapplicable. Thereafter, this employer was put on notice that, once it was authoritatively decided that the U. S. Cartridge Company principle was applicable to military construction projects, it would be in violation of the Act if it continued to ignore its terms. We do not attempt to say just when counsel was under the duty to learn of this Court's decision after it was announced in June 1958. We have no way of knowing whether the client placed on counsel the duty to keep abreast of the current decisions. We think, however, that there was an inescapable obligation on the employer, under the circumstances present in this case, to the need that it be told at the earliest practicable moment of any adverse decision touching on the matter in controversy. So long as an employer wishes to rely on advice of counsel to excuse his non-compliance with the law it must be made perfectly clear that he has plainly placed on counsel the burden of keeping currently informed of adverse decisions. It cannot seriously be argued that had able counsel of record in this case so enjoined by their client they would not have discovered that this Court had decided the Empire Gas case covering the precise point in issue before it was called to their attention by the Department of Labor representatives seven months after it was published. It was undoubtedly profitable to the employer not to pursue the matter too closely. For that or other reasons it did not keep abreast of the law. In short, it failed to do all it was legally required to do to discharge its legal obligations to its employees in resolving this issue against itself.
 
 
 17
 The Government urges that the failure of the employer to offer reimbursement of the wages illegally retained is a further indication of the lack of good faith in the employer's promise of future compliance. While we do not hold that this factor can rise to such legal significance, it is undoubtedly true that if the employer had undertaken to make its employees whole, either as to road construction projects, as to which there was never any doubt about coverage, or as to military construction projects back to the date when the employer could, by exercising due diligence, have learned of this Court's decision in Empire Gas, it would then have become abundantly clear, as is not now the case, that the failure to act more promptly was not attributable to the employer's purpose to profit to the maximum pending a final determination in the litigation. Such conduct, in other words, would have been a well-nigh positive demonstration of good faith.
 
 
 18
 Consistent with the views we have expressed most recently in Mitchell (Goldberg) v. Pidcock et al., supra, we conclude that the judgment must be reversed and the case remanded with directions to the trial court to enter an injunction.
 
 
 19
 Reversed and remanded.
 
 
 
 Notes:
 
 
 [1]
 Government contracts for work on military bases provided that contractors should comply with the Davis-Bacon Act, 40 U.S.C.A. § 276a et seq. and the eight hour law. Regulations of the Department of Army prohibited any mention of the Fair Labor Standards Act in the construction contracts
 
 
 
 20
 CAMERON, Circuit Judge (dissenting).
 
 I.
 
 21
 The sole question involved in this case, in my opinion, is this: Is the district court's finding that there is no likelihood of future violations of the Fair Labor Standards Act by Ballenger Paving Company so clearly erroneous that this Court should reject it and set aside the district court's denial of an injunction by adjudging that such a holding constitutes an abuse of the discretion vested in it? This Court stated the basic premise of the question in Mitchell v. Hodges Contracting Co., 1956, 238 F.2d 380, 382-383: "The controlling factor is the probability or improbability of further violations." And see Swift & Co. v. United States, infra.
 
 
 22
 I think that much which is said in the majority opinion begs that question. The decision of this case involves the very nature of injunctive relief. Concerning that nature the Supreme Court used this language:[1]
 
 
 23
 "A grant of jurisdiction to issue compliance orders hardly suggests an absolute duty to do so under any and all circumstances. We cannot but think that if Congress had intended to make such a drastic departure from the traditions of equity practice, an unequivocal statement of its purpose would have been made. * *
 
 
 24
 "We are dealing here with the requirements of equity practice with a background of several hundred years of history. Only the other day we stated that `An appeal to the equity jurisdiction conferred on federal district courts is an appeal to the sound discretion which guides the determinations of courts of equity.' Meredith v. City of Winter Haven, 320 U.S. 228, 235, 64 S.Ct. 7, 11, [88 L.Ed. 9]. The historic injunctive process was designed to deter, not to punish. The essence of equity jurisdiction has been the power of the Chancellor to do equity and to mould each decree to the necessities of the particular case. Flexibility rather than rigidity has distinguished it. The qualities of mercy and practicality have made equity the instrument for nice adjustment and reconciliation between the public interest and private means, as well as between competing private claims. * * *"
 
 
 25
 Based upon the decision and upon a rule I would think to be of such universal acceptance as not to be questioned, this Court recently said, in a wage and hour case:[2]
 
 
 26
 "Even assuming appellant's contentions to be sound in both instances [that is, that appellee had been guilty of violating the Fair Labor Standards Act in the past], the Court would have been justified in either granting or denying injunctive relief under the broad discretion lodged in it by accepted equitable principles. Mitchell v. Hodges Contracting Co. * * *
 
 
 27
 "The trial Court evidently reached the conclusion that more would be accomplished towards enforcement of the law and towards bringing appellant into cooperative conformity with its provisions by withholding the drastic remedy of injunction than by using it.
 
 
 28
 "The nature of injunctive relief is that it is prospective, prophylactic, preventive, — not punitive. By bringing about a better attitude on appellant's part towards the Act, and his plighted purpose to obey it scrupulously and ungrudgingly, the Court below was using its equity powers in consonance with their best traditions. * * *
 
 
 29
 "The District Judge, having the long-term responsibility for the enforcement of this law and others like it in a large district in Texas, and being acquainted with local conditions and having observed appellant and the government agents as the contest before him unfolded, was in better position than we are to assess and solve this problem. We are not willing to set aside the discretion employed by him in fashioning his decree to serve the interest of the litigant and the public."
 
 
 30
 As far as I know, no court decision has questioned our words in the foregoing quotation as a correct statement of the law. The court below heard the entire case, holding more than one pre-trial conference and considering many depositions and other evidence which are not in the printed record. The case was tried by a judge whose experience has extended over a period substantially as long as the combined judicial experience of the three Judges of this panel. He is a judge of recognized ability and fairness, and he had had a much better acquaintance with the problems arising in that area and of the facts placed before him than we could possibly get. The words of his statement of the case and his findings, to my mind, carry great weight:
 
 
 31
 "For several yeas prior to April, 1959 there existed in the minds of defendant and its executives, [doubt] as to whether defendant's operations in connection with runways on military airbases came within the provisions of said Act. It was generally believed among such contractors that the Act did not apply and defendant company was so advised by able counsel. The belief that the Act did not apply was encouraged and fostered by other departments of the United States Government whose primary interest was not to enforce the Fair Labor Standards Act but to save as much money as possible in regard to such operations * * *
 
 
 32
 "In April, 1959 defendant gave notice to all of its agents and employees concerning compliance with said Act, and since that time complete compliance has been had in all of its operations. There has not been a single instance where failure to comply with the Act is charged. There is no reason whatsoever to believe or even to suspect that the defendant will in the future fail to comply in all respects with the Act. Defendant before this case was tried gave the Government full access to its books and records, and has never concealed anything. A finding is demanded by this Court that there is no necessity for any injunction in this case." [Emphasis supplied.]
 
 
 33
 The statute under which this proceeding is brought does not require the issuance of an injunction, but merely gives the court jurisdiction to restrain violations of the Act for cause shown.[3] One of the essential ingredients of good cause is a showing that the accused person is likely to inflict on the accuser irreparable injury. The trial court found that there was no such showing and, as far as I can find, the record reflects no such showing. The court below stated that the principle had existed for centuries "that injunction is a harsh remedy and will not issue unless there is a probability of irreparable damage." With respect to such likelihood the court stated: "that there is no reason whatsoever for anyone to suspect that there will be any future violations."
 
 
 34
 I am unable to find in this record any justification whatever for declaring that the action of the court in denying an injunction was an abuse of its discretion.
 
 II.
 
 35
 The record before us reflects proof which amply justified the finding of the court below that "any violations of said Act by the defendant were not done willfully, that defendant company was acting as were other companies in the same business under the belief that there was no coverage, and that there is no reason whatsoever for anyone to suspect that there will be any future violations."
 
 
 36
 In testing whether that finding was clearly erroneous, we take a brief look at the law relating to coverage and to issuing or refusing an injunction, as it was recognized in this Circuit on October 18, 1957 when this action was begun, and on April 18, 1959 when appellee issued instructions that employees in its construction work being done for the government at airports and similar installations should be paid in obedience to the Fair Labor Standards Act. We draw again on this Court's opinion in Mitchell v. Hodges, supra, 238 F.2d at page 383:
 
 
 37
 "* * * the right to challenge substantial questions of coverage ought to be freely open to good faith litigation by an employer unfettered, in that process, by the prospect of contempt proceedings."
 
 
 38
 In this brief discussion the pertinent cases will be taken up along with the facts disclosed by the record.
 
 
 39
 On the crucial dates there was no decision of the Supreme Court relating to the question of coverage of military air bases. Until the decision of this Court in Mitchell v. Empire Gas Engineering Company, 256 F.2d 781 (July, 1958), there had been no decision of this Court holding that military air base construction was covered by the Act. The two cases theretofore decided by it had indicated noncoverage.
 
 
 40
 The former of these was Parham v. Austin Co., 5 Cir., 1946, 158 F.2d 566, 567. We held that watchmen and guards employed by a contractor engaged in constructing a new bomber plant for the United States were not engaged in interstate commerce nor in production of goods for commerce, and that the Act did not apply to them. The materials used in the construction came largely from beyond the confines of the state by train and by truck, and these guards controlled the admission of these carriers into the construction grounds. We said:
 
 
 41
 "In the instant case the employer was engaged in the construction of a plant that was intended some day to produce goods for commerce. This was a war project being constructed as a place in which it was intended to manufacture bombers."
 
 
 42
 The latter case was Reed v. Murphey et al., 5 Cir., 1948, 168 F.2d 257, reversed in part by Supreme Court, 335 U.S. 865, 69 S.Ct. 105, 93 L.Ed. 410, on questions not relating to this controversy. We there held that employees engaged in the construction of a navy training camp and advanced base depot were not covered by the Fair Labor Standards Act.
 
 
 43
 April 16, 1954, the Comptroller General of the United States issued an official opinion to the Secretary of Defense ruling that the Fair Labor Standards Act did not apply to defense work. He stated in part: "It is evident that the proposed provision would tend to increase the cost to the government of the work to be done [and] there is no legal justification for the inclusion * * *"
 
 
 44
 The Department of the Army followed this ruling by omitting from its contracts the requirement of observance of the Fair Labor Standards Act, while at the same time inserting requirements that other related Acts be observed. An officer of the Air Force testified that a like policy was pursued by that department of the armed services. In the fall of 1957 Lockheed, one of the largest aircraft corporations, ruled that Ballenger was not required to observe the Fair Labor Standards Act in the work then being done for it.
 
 
 45
 It was stipulated by the parties at the trial that Ballenger had adequate personnel and record-keeping facilities and other facilities for compliance with the Fair Labor Standards Act; where Ballenger had attempted compliance, it had been satisfactory and the records kept were likewise adequate; that Ballenger had not at any time concealed facts, falsified records or withheld information before or after the institution of this civil action; where Ballenger recognized the applicability of the Act the compliance had been satisfactory.
 
 
 46
 September 11, 1959, the court below ordered appellee to respond to appellant's request for admission, giving a list of all of the projects in which it was engaged beginning with June, 1958 and extending through September 8, 1959. A part of that response is in these words:
 
 
 47
 "With the exception of military construction defendant has complied with the Fair Labor Standards Act on all of its construction projects. Defendant will comply with the Fair Labor Standards Act on all United States Government projects in the future and will continue to comply with the Fair Labor Standards Act on all projects as it has heretofore consistently done.
 
 
 48
 "Defendant had no knowledge of the Empire Gas Engineering Company decision until sometime in the latter part of February or early part of March [1959]; that prior to that time defendant was under the bona fide and sincere belief that military construction was not covered under the Fair Labor Standards Act and any violations of said Act prior thereto were in good faith and were not done deliberately to avoid or evade the law; that defendant's president desired to learn more about the Empire Gas Engineering Company case to ascertain whether it was a bona fide case or a friendly, uncontested case for the purpose of establishing a new precedent in the Fair Labor Standards Act interpretation. That defendant's president made inquiry through representatives of the Empire Gas Engineering Company in March, 1959 and learned that said case was actually contested; that this fact was communicated to defendant's counsel in Greenville and a decision was reached to begin complying with the law as announced by the court in the Empire Gas Engineering Company case. That a memorandum to that effect was transmitted to all projects effective for the week ending April 25 [beginning April 18] 1959, and compliance has been had and will be had with said interpretation of said Fair Labor Standards Act henceforth." [Emphasis added.]
 
 
 49
 To this statement was added a summary of thirty-seven contracts between the appellee and representatives of the armed services and with aircraft companies covering extensive projects in three states. Analysis of these summaries shows that in nine instances, appellee had not applied the Act before April 18, 1959, but did apply it after that date. In thirteen instances, appellee had complied with the Act during the entire performance, and in fifteen instances, there had been no compliance with the Act. It is clear from this analysis that appellee recognized that the Act applied to some of its contracts, that it did not apply to others; and that appellee thought that it did not apply to the nine mentioned, but came into compliance when it learned that the Act did apply.
 
 
 50
 Meantime, the law as to the application of the Act was in a state of uncertainty in this Circuit, and this uncertainty guided the actions of contractors generally. A like uncertainty existed as to whether courts in this Circuit would grant injunctive relief when it appeared that there had probably been wrongful nonobservance of the Act, but that there was no probability of future nonobservance. In 1956, this Court rendered its opinion in Mitchell v. Hodges, supra. That carefully reasoned opinion has been accepted by this Court and apparently by business institutions generally as laying down standards by which their actions should be judged when they were brought under an accusation by the Wage and Hour Division:
 
 
 51
 "The Secretary correctly recognizes that injunction, though authorized as a specific sanction under the Act, § 17, being equitable in nature, need not issue as a routine, absolute consequence of a finding of non-compliance and the existence of coverage. For the granting or denial of an injunction — and perhaps of greater importance, the delicate drafting of its terms — must inevitably be left initially to the sound discretion of the District Judge, Walling v. Florida Hardware Co., 5 Cir., 142 F.2d 444. It is he who has seen unfolded the intimate details of the controverted activity, the approach and attitude of the parties reflecting the circumstances giving rise to the controversy, the employer's previous actions of non-compliance or litigation, the moral and business responsibility of the employer, the extent of which promises of future compliance are something more than empty, idle words unmatched by the institution of effectual corrective procedures, or are undependable contrition under pressure of legal action, whether litigious contention is the legitimate good faith quest for legal determination or the mere pretense, for past or future actions, to thwart effective compliance and many other similar and related factors from which the Judge can determine the probability of future compliance or violations.
 
 
 52
 "Where these have been properly evaluated, the action of the Trial Court, whether granting or denying an injunction, will be sustained. But where this has not been the case, reviewing courts have not been slow to act by ordering the issuance of injunction.
 
 
 53
 "We certainly see neither disregard nor misapplication of these subtle, delicate yet profound standards by this careful District Judge."[4] [Emphasis added.]
 
 
 54
 Appellee's conduct here was subjected to a critical examination by the court below. It found throughout that a spirit of cooperation had been exhibited; that appellee had never been a party to litigation; that the moral and business responsibility of Charles P. Ballenger, Jr., the active operator and policy-maker of the business, was unquestioned.[5] His records were all made available to the Government promptly upon request, and there was no suggestion that he had fallen down on any agreement with the Government. He came into compliance with the Act on April 18, 1959, while the pending litigation against appellee was not completed until July, 1960. In the meantime he had availed himself of the services of lawyers of the highest class in South Carolina and in Atlanta. If the foregoing standards suggested in Hodges are still valid, it is difficult to understand how the trial court could have reached any other conclusion than the one it did. Appellee met every one of these standards in letter and in spirit.[6]
 
 
 55
 The decisive conclusion here reached by the court below was:
 
 
 56
 "This Court is ruling as a Conclusion of Law that where a contractor is doing work, not operating in compliance with the Fair Labor Standards Act, but in a good faith belief that it does not apply, where other contractors of the same belief are doing likewise, where the law is in some confusion, and where, as soon as informed by his counsel that his operations are within the Act fully complies therewith, and there are no circumstances indicating any possibility of future violations, injunction will not be granted."
 
 
 57
 No one seems to doubt that confusion did exist as to the question settled in Empire Gas, and that this decision blazed a new trail which had not been recognized before the decision was rendered. The language of Empire shows the basis for the conclusion reached in that case that the district court had not abused its discretion in refusing to grant an injunction so zealously contended for by the Secretary in (256 F.2d page 785):
 
 
 58
 "At the trial the Secretary made an effort to show that, subsequent to the decision in [Mitchell v. C. W. Vollmer & Co.], supra,[7] an attorney who was experienced in the field of labor law should have been aware that the employment of construction workers engaged in performing the Empire contracts was subject to the overtime provisions of the Fair Labor Standards Act. What we have already said will indicate that a good faith conclusion could have been reached that the employees were not in commerce. The district court found that the Act did not apply. It would be difficult, under such circumstances, to question the court's determination that Empire acted in good faith upon the honest advice of able counsel in its failure to comply with the Act. * * *
 
 
 59
 "It should not be forgotten that the issuance of injunctions in cases such as this is discretionary, as it is in most of the situations where this equitable remedy may be granted. [Citing cases.] The Supreme Court has said:
 
 
 60
 "`The purpose of an injunction is to prevent future violations, Swift & Co. v. United States, 1928, 276 U.S. 311, 326, 48 S.Ct. 311, 314, 72 L.Ed. 587, and, of course, it can be utilized without a showing of past wrongs. But the moving party must satisfy the court that relief is needed. The necessary determination is that there exists some cognizable danger of recurrent violation, something more than the mere possibility which serves to keep the case alive. The chancellor's decision is based on all the circumstances; his discretion is necessarily broad and a strong showing of abuse must be made to reverse it.' * * *" [Emphasis supplied.]
 
 
 61
 The labored effort of the majority opinion to hold the court below in error in exercising its discretion is difficult to understand. I do not believe a case will be found in the books where the proof shows an employer of such high character and trustworthiness, whose word given long before the case against him was completed, is entitled to greater credit. I think it is this Court's duty to protect the business fraternity in their just efforts to determine and assert their rights, and that such action should not be penalized as is done here. This is particularly true when, to reach the majority's decision, it is necessary to brand, as completely untrustworthy, the formal promise under oath that the Act would be observed in the future which was made by appellee's authorized spokesman.
 
 
 62
 I do not believe we serve the cause of justice or of respect for law by such an action as is here taken. But another injunctive order has been put upon the books. Doubtless great satisfaction will come to those who seek to disparage on every occasion the concept that ours is a government of laws and who rejoice to exalt government by executive order and judicial flat.
 
 
 63
 I respectfully dissent.
 
 
 
 Notes:
 
 
 [1]
 Hecht Co. v. Bowles, 321 U.S. 321, 329, 64 S.Ct. 587, 591, 88 L.Ed. 754. The Supreme Court there reversed the decision of the Court of Appeals and remanded for consideration whether the trial court had abused its discretion in Brown v. Hecht Co., 78 U.S.App.D.C. 98, 137 F.2d 689. That court had reversed the decision of the District Court, Brown v. Hecht Co., 49 F.Supp. 528, 532, which had denied an injunction under its general equity powers, stating as the basis for such denial:
 "In a case such as this an injunction should not issue unless thereby better compliance with law may be enforced. * * * and in my judgment an injunction would not be in the public interest."
 That case had arisen under the Emergency Price Control Act when it was not contradicted that a large department store had violated that law in several thousand instances.
 
 
 [2]
 Mitchell, Secretary, etc. v. Bland, etc., 5 Cir., 1957, 241 F.2d 808, 810-811. This case is further dealt with in my dissenting opinion in No. 18687, Mitchell v. Pidcock, et al., 5 Cir., 299 F.2d 281
 
 
 [3]
 29 U.S.C.A. § 217 provides: "The district courts * * * shall have jurisdiction, for cause shown, to restrain violations of section 215 of this title * * *."
 
 
 [4]
 The opinion quotes from a prior case where we had said: "Lip service to a law, with a background of violations, does not guarantee future compliance."
 
 
 [5]
 The proof showed that Mr. Ballenger was a man of unquestioned integrity — a business and civic leader in Greenville, South Carolina, who had been a deacon of the First Presbyterian Church, National President of the Alumni Association of Duke University, President of the Carolina Chapter of the Association of General Contractors of America, a member of the Board of directors of the YMCA, and an all-around substantial citizen
 
 
 [6]
 The evidence showed the presence of none of the factors which led to the decision of this Court in Mitchell v. Blanchard, 1959, 272 F.2d 574. Our decision there came along in 1957, and the next decision of importance was Mitchell v. Empire Gas Engineering Co., 5 Cir., 1958, 256 F.2d 781
 
 
 [7]
 349 U.S. 427, 75 S.Ct. 860, 99 L.Ed. 1196